Larry **STEINBERG** et al.

v.

**Jack A. FUSARI, Commissioner of Labor, et al.**

Civ. No. 15104.

United States District Court,
D. Connecticut.

Sept. 17, 1973.

Raymond J. Kelly, John A. Dziamba, Tolland-Windham, Legal Assistance, Arthur P. Meisler, Willimantic, Conn., Elliot Taubman and Ralph U. Bergman, Legacy, Inc., Norwich, Conn., Matthew Shafner, O'Brien, Shafner & Garvey, Groton, Conn., John M. Creane and Donald H. Tamis, Bridgeport, Conn., for plaintiffs.

Robert K. Killian, Atty. Gen. of Conn., Donald E. Wasik, Asst. Atty. Gen., Hartford, Conn., for defendants.

Before SMITH, Circuit Judge, and BLUMENFELD and NEWMAN, District Judges.

## MEMORANDUM OF DECISION

J. JOSEPH SMITH, Circuit Judge:

This suit presents the question of whether either the Fourteenth Amendment, or § 303 of the Social Security Act, 42 U.S.C. § 503(a)(1), requires that recipients of Connecticut unemployment compensation benefits be afforded a Goldberg v. Kelly[1] hearing prior to

being deprived of such payments. In addition, this case requires us to interpret the precise precedential significance of a series of rather bewildering summary dispositions of factually related suits by the Supreme Court.[2] For the reasons given below, we conclude that the Connecticut system fails to meet minimal due process standards, and therefore must be enjoined.

## I.

While the relevant factual background is complex, it is also undisputed, and has been the subject of a rather lengthy stipulation. Unemployment insurance benefits in Connecticut are paid entirely out of a trust fund maintained by the contributions of in-state employers, including interest and penalties.[3] So long as the state program meets federal statutory requirements, its costs of administration are met by the federal government, pursuant to § 302 of the Social Security Act, 42 U.S.C. § 502. The Social Security Act requires, *inter alia,* that states receiving such assistance have methods of administration "reasonably calculated to insure full payment of unemployment compensation when due," 42 U.S.C. § 503(a)(1).

The claimant's entry into the unemployment compensation system begins with the filing of a valid initiating claim. Conn.Gen.Stat. § 31–230.[4] The state system of determining initial eligibility is not under attack here. After a determination of such eligibility is made, the claimant is instructed to report bi-weekly to his local unemployment compensation office. Upon reporting, he fills out a "Continued Claim for Unemployment Compensation," (U.C.–46),

1. 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

2. *See* Torres v. New York State Department of Labor, 405 U.S. 949, 92 S.Ct. 1185, 31 L. Ed.2d 228 (1972), reh. denied, 410 U.S. 971, 93 S.Ct. 1446, 35 L.Ed.2d 707 (1973) ; Indiana Employment Security Division v. Burney, 409 U.S. 540, 93 S.Ct. 883, 35 L.Ed.2d 62 (1973). These cases are discussed in some detail in part IV, *infra.*

3. Conn.Gen.Stat. §§ 31–261 through 31–271 deals with the creation and administration of that fund, including collection of employers' contributions.

4. The standards for eligibility are set out in Conn.Gen.Stat. § 31–235 ; various reasons for disqualification appear in § 31–236.

upon which he swears to his availability for work and his "reasonable efforts" to find work, among other things. The claimant also fills out a "Continued Claim Work Effort Information Form," (U.C.–45) when making his bi-weekly visit. He then enters the claims line and eventually presents the completed forms to an employee of the Unemployment Compensation Department.[5] If no questions arise, the claimant is routinely given his benefit checks for the two-week period at issue.

If the claims line employee raises an issue of possible disqualification, he sends the claimant to another line for a "seated interview." Upon reaching the head of this line, the claimant is interviewed by a "Fact Finding Examiner," who seeks to ascertain facts as to possible disqualification. If the examiner decides that the claimant is in fact qualified to receive benefits for the period in issue, he simply sends him back to the claims line, and checks are issued. If, however, the examiner decides that the claimant does not meet the statutory criteria for receiving assistance, the claimant is not given his checks, and is told that he will receive written notification of the Department's decision concerning his eligibility for the weeks in question. A letter is then sent out under the signature of the office manager, stating the reasons for non-payment and citing a statutory provision therefor.

Of necessity, questions will often arise during the "seated interview" which involve third-party information. If such a question arises, the fact finder will attempt to contact the third party while the claimant is present, and will take the information into consideration when reaching a decision. However, if the third party cannot be reached, the claims examiner may still proceed to make his own determination as to eligibility.[6]

The most common reason for the denial of benefits to a claimant is for failure to comply with Conn.Gen.Stat. § 31–235(2), which requires that applicant make "reasonable efforts to obtain work" and be "able" and "available" to do the same.[7] Other common reasons for disqualification include refusal of a suitable job offer, see Conn.Gen.Stat. § 31–236(1), and the fact that an applicant has received some form of disqualifying income, see § 31–236(4) and (7).

The eligibility determination is made on a week-to-week basis, even though the claimant visits the office only bi-weekly. Thus, it is possible that the fact finder will conclude that a claimant failed to make reasonable efforts to find work in one of the weeks at issue, yet allow benefits for the other. Similarly, it is the Department's policy that a claimant remains eligible for subsequent time periods so long as he satisfies the eligibility requirements for those periods, without regard to his past record.[8]

The Department deviates from its "seated interview" procedure in at least two instances. If an employee of the State Employment Service Department[9]

5. The state Labor Department contains an Employment Security Division, Conn.Gen. Stat. § 31–237(a), subject to the supervision of the labor commissioner as administrator, see § 31–222(a). Within the division, there are two departments, the state Employment Service Department and the Unemployment Compensation Department. § 31–237(a). It is with the latter that the claimant chiefly deals.

6. Subject to the statutory directive that coverage, eligibility and non-disqualification are to be presumed in doubtful cases. Conn. Gen.Stat. § 31–274(c).

7. The parties originally stipulated that these reasons accounted for between 60 and 70 per cent of all denials of benefits resulting from "seated interviews." At the hearing before this court, the defendant stated that this figure was in error, being based in part upon original denials of initiating claims. Defendant was unable, however, to provide us with a more accurate figure.

8. In practice, some of those who have been found ineligible for one claims period and have filed appeals have had later claims denied on the ground that "they have appeals pending." This is contrary to Department policy.

9. See note 5, supra.

has provided information that a claimant has refused to accept a job referral, notice is sent to the claimant scheduling a hearing for a date and time certain and advising claimant of the reason for the hearing and of his right to bring counsel and witnesses.[10] The claimant then has the right to confront the employee at this hearing. In the routine case, benefits continue until the hearing is held.[11] Similarly, if information concerning the refusal of a suitable job comes from an interested employer—one whose "merit rating" account has been charged because of the termination of the claimant's employment [12]—notice of a proposed hearing is sent both to the claimant and the employer, and a procedure similar to the one above is followed.

However, since the majority of cases involve a fact finder's determination that the claimant has not made reasonable efforts to find work, a pre-termination hearing is the exception, rather than the rule. Once the claimant receives written notice of the fact finder's decision, he may file an appeal. This appeal is heard by an Unemployment Compensation Commissioner, see Conn.Gen. Stat. §§ 31–241 and 31–242 who determines the matter of eligibility *de novo.* Unless "good cause" is "shown," Conn. Gen.Stat. § 31–241, benefits for the period at issue are not paid pending appeal. No attack is made in this suit upon the procedures employed in the eventual Commissioner's hearing, which are statutorily mandated "as far as possible," to be "in accordance with the rules of equity." Conn.Gen.Stat. §§ 31–244 to 31–248.[13, 14]

## II.

A review of the factual situations of three of the named plaintiffs will serve to put the general background outlined above into sharper perspective.[15] Larry

10. If the claimant is scheduled to appear for a regular bi-weekly visit within two days, the notice is given to him personally then. The claimant can ask for an immediate hearing on that date, or can wait approximately five days for a hearing. If he opts for the latter course, he is routinely given his benefit checks. *But see* note 11, *infra.*

11. Benefit checks may be withheld if the claimant provides the examiner with other disqualifying information, unrelated to the hearing subject matter, during his regular bi-weekly visit. For example, if a claimant awaiting a hearing discloses that he has been in the hospital for the past two weeks, the check may be withheld even though he is awaiting a hearing concerning his refusal of an allegedly suitable job referral.

12. Employers' contributions to the unemployment compensation fund are determined through the operation of a complicated "merit rating" index system. Conn.Gen.Stat. § 31–226. *Inter alia,* the system operates to charge the employer's account for those claimants whose employment was terminated by him, and credits the employer for prompt rehiring of separated employees.

13. The state Unemployment Compensation Commission is a statutorily created body, comprised of six members, five from specified districts and one from the state at large. Conn. Gen.Stat. § 31–238. It is a separate entity from the unemployment compensation department of the labor department.

14. Appeal may be taken from the Commissioner's decision to the Superior Court, and ultimately to the state Supreme Court. Conn.Gen.Stat. § 31–249.

15. The original complaint named as plaintiffs Larry Steinberg and Cecil Paskewitz, and requested a determination that the suit proceed as a class action. In a memorandum of decision dated November 13, 1972, Judge Newman granted the plaintiffs' motion to convene this statutory three-judge court; at the same time, he deferred consideration of the class action issue for this tribunal. For the reasons set out in part III, *infra,* we today hold that this suit may proceed as a class action.

At the time that the original motion to convene this court was under consideration, twelve additional plaintiffs sought to intervene. In the November 13 memorandum, Judge Newman denied ten of these requests. He granted the motions of Delia Triana and Juan Miranda to intervene, noting that these two were presently back on the unemployment compensation rolls after the disposition of their appeals, and thus had a particular interest in the procedures that might be employed in any subsequent terminations of their benefits.

The situation of Cecil Paskewitz has been the subject of a recent change of position of the defendant Administrator. Paskewitz had

Steinberg had filed a valid initiating claim for benefits in Willimantic on or about April 17, 1971, and received weekly benefits through October 9 of that year. On October 27, Steinberg reported to the Willimantic Unemployment Compensation Office for his bi-weekly visit, and to claim benefits for the weeks ending October 16 and 23, 1971. He was directed from the claims line to a "seated interview." After some discussion with a fact finder, Steinberg was told that he would not receive the two weekly checks at issue, for failure to use "sufficient efforts to obtain work."

A formal notice, citing the statutory requirements of Conn.Gen.Stat. § 31–235(2) was received by Steinberg on November 1, 1971, disqualifying him from benefits retroactive to October 10. Steinberg filed an appeal to the Unemployment Compensation Commission on November 5; a hearing was held on January 13, 1972. On May 10, 1972, the Commissioner upheld the Departmental fact finder; Steinberg did not seek review in the courts.

Delia Triana had received benefits in Bridgeport from June 18 through July 8, 1972. On about July 24, 1972, she visited the Bridgeport office to file for benefit checks covering the weeks ending July 15 and 22, 1972. She was directed to a "seated interview," where it was determined that she had not made sufficient efforts to find work for the two periods, and she did not receive her checks. At two subsequent bi-weekly appointments, Mrs. Triana was disqualified from receiving benefits for the period between July 29, 1972, and August 18, 1972, on similar grounds.

Mrs. Triana filed her original appeal on August 7, 1972; her case was heard on October 27. On November 10, 1972, the Commissioner upheld the denial of benefits for the first two-week period, but held that Mrs. Triana was entitled to benefits for the latter period. His decision was not appealed by either side.

Juan Miranda presents a similar situation. After the familiar "seated interview," he was denied benefits for the weeks ending August 19 and 26, 1972, on the grounds of having made insufficient efforts to find work. He was notified on September 11, 1972, that all claims from August 13, 1972, onward were disapproved on the above grounds. He filed a prompt notice of appeal; hearing was held on October 17, 1972. On October 24, 1972, the Commissioner held that the benefits from August 13 to the date of the appeal hearing were wrongly withheld. The Department did not appeal, and Miranda eventually received checks covering this time period.

### III.

We turn first to plaintiffs' request to have this suit designated as a class action. The relevant class is claimed to be all present and future recipients of unemployment compensation benefits whose benefits are subject to termination without a prior hearing, with the exception of those persons whose benefits are terminated simply

---

received weekly benefits from August, 1971, until February of 1972, covering a period of some 26 weeks. In February of 1972, Paskewitz applied for extended benefits under Conn.Gen.Stat. § 31–232b et seq. The application was initially approved, but when Paskewitz went, on March 2, 1972, to the Enfield office to collect his extended benefit checks, he was told that he was no longer eligible and would not receive further assistance. His appeal of that decision has been heard by an Unemployment Commissioner; at the time this case was argued, no decision had been forthcoming.

The defendant Administrator now concedes that Paskewitz should have been given a hearing on the underlying issue, which involved a determination of whether he had compiled sufficient wage credits to have been initially eligible for benefits. The defendant has changed its policy so that future cases involving such entitlement determinations will be handled in the following manner. Claimants are to be notified of a hearing at a time and place certain, at which they may bring counsel and present evidence on the entitlement issue. Benefits will be paid to affected claimants until a written decision on the merits has been issued, following the noticed hearing.

because of exhaustion of entitlement under Conn.Gen.Stat. § 31–236. This class is so numerous that joinder is impracticable, and there are clearly common questions of law and fact. In addition, we find that the claims of plaintiffs Steinberg, Triana and Miranda [16] are typical of the claims of the class, and that these three representative plaintiffs will fairly and adequately protect the class interests. Since the defendant Administrator has rather clearly acted on grounds generally applicable to this class in allowing benefits to be terminated after a "seated interview," Rule 23(b)(2)'s requirements are met, and we designate this a class action. *See Wheeler v. State of Vermont*, 335 F. Supp. 856, 862 (D.Vt.1971) (3-judge court); *Crow v. California Department of Human Resources*, 325 F.Supp. 1314, 1316 (N.D.Cal.1970); *Torres v. New York State Department of Labor*, 318 F.Supp. 1313, 1317–1318 (S.D.N.Y.1970).

■ We deal next with the defendant Administrator's claim that since the three class representatives have each now had a hearing before an Unemployment Commissioner, this case is moot. We cannot agree. This suit was filed as a class action, and, although the formal determination of class status was made only today, the case has presumptively been a class suit since its inception. *See* 3B J. Moore, Federal Practice, ¶ 23.50 at 23–1103 & n. 12; *Torres, supra*, 318 F. Supp. at 1317. Thus, the fact that the named representatives have received their Commissioner's hearings does not end the matter; there are numerous class members who have either had their benefits terminated and have not yet received hearings, or who are subject to like treatment in the future. As to them, the matter is far from moot, and it would serve little but form for us to require these class members to intervene here—as some of them have sought [17]— simply to keep the name of someone who has not yet received a hearing in the case caption. The fact that the named plaintiffs have finally received hearings does not moot this action. *See* 3B J. Moore, *supra*, ¶ 23.40 at 23–651, 23–652 and cases cited therein.

There are other compelling reasons for not finding this case to be moot. The defendant Administrator has not taken the position that termination of benefits without hearing will not recur; indeed, he vigorously argues the merits of the present "seated interview" system. Thus, we can hardly conclude that "there is no reasonable expectation that the wrong [if in fact a wrong there be] will be repeated." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Given the delays inherent in the litigation process, to find this case moot would amount to a directive to the defendant that the challenged conduct may be continued regardless of its legality, since it is quite unlikely that any plaintiff can successfully pursue a suit to completion before his Commissioner's hearing is scheduled. Since the class has a continuing controversy with the Administrator, this suit is not moot. *See Mindo v. New Jersey Department of Labor & Industry*, 443 F.2d 824 (3rd Cir. 1971); *Wheeler, supra*, 335 F.Supp. at 860; *Crow, supra*, 325 F.Supp. at 1316; *Torres, supra*, 318 F.Supp. at 1316– 1317.[18]

---

16. Given the defendant Administrator's changed position with respect to Cecil Paskewitz and those similarly situated, *see* note 15, *supra*, we do not name Paskewitz as a class representative.

17. *See* note 15, *supra*.

18. The same conclusion would seem to have been reached, *sub silentio*, in California Department of Human Resources Development v. Java, 402 U.S. 121, 91 S.Ct. 1347, 28 L.

Ed.2d 666 (1971). In that case, two California unemployment compensation recipients had challenged that state's practice of suspending benefit payments when an employer took an appeal from an initial eligibility determination. They filed a class-action complaint in federal district court; they then had hearings before an Appeals Board Referee. The three-judge district court enjoined the California procedure on both constitutional and statutory grounds, 317 F. Supp. 875 (N.D.Cal.1970), never discussing

Indiana Employment Security Division v. Burney, 409 U.S. 540, 93 S.Ct. 883, 35 L.Ed.2d 62 (1973), upon which the defendant relies, does not compel a different result. In *Burney*, a three-judge Indiana district court had held, in factual circumstances analogous to those presented here, that Indiana's system of terminating unemployment benefits without a prior hearing was in conflict with the "payment when due" provisions of the Social Security Act, 42 U.S.C. § 503(a)(1). The Supreme Court noted probable jurisdiction, 406 U.S. 956, 92 S.Ct. 2058, 32 L.Ed.2d 342 (1972), but on January 17, 1973, in a brief *per curiam* opinion, remanded the case to the district court "to consider whether it has become moot." The Court noted that Mrs. Burney, who was the only named class representative, had succeeded, at a point in time after the entry of the district court summary judgment, in having her determination of ineligibility reversed. She had consequently been awarded fully retroactive benefits. In view of "the question whether there continues to be a case or controversy in this lawsuit," the Supreme Court remanded to the district court for further findings.

At the outset, it is useful to note exactly what the Supreme Court did and did not do in *Burney*. It did not find the case to be moot, but only raised the issue and asked the district court to consider it. Thus, narrowly read, *Burney* only stands for the proposition that when the only class representative succeeds in gaining full retroactive benefits while the case is pending before the Supreme Court, the district court should consider the issue of mootness. Even if the case at hand were at all factually similar to the *Burney* situation, this court has done precisely that, and has concluded that the case is not moot.

And, as must seem evident from the above summary of the facts in *Burney*, there are a number of pertinent points

of distinction between that case and this one. While Mrs. Burney was the sole class representative there, here there are three—Steinberg, Triana and Miranda. Of these three, only Miranda is in a situation similar to that of Mrs. Burney, having received retroactive benefits after winnng his appeal. Steinberg never "succeeded in obtaining a reversal of the initial determination of ineligibility," 409 U.S. at 541, 93 S.Ct. at 884, made at the "seated interview"; Mrs. Triana succeeded only in part.

Moreover, we note that the "new facts" that prompted the *Burney* remand —Mrs. Burney's winning of her appeal —took place after the district court decision was rendered. The Supreme Court may well have simply wanted the district court to evaluate this new development, particularly in light of the possibility that the sole named class representative might not now be interested in further vigorously pursuing the suit. Here, all the operative facts have taken place *before* today, and have been given our full consideration. We have had an opportunity to witness the able prosecution of this suit by the class representatives even after they had received Commissioner's hearings. We are confident that such exemplary representation will continue, should further proceedings be necessary. Thus, whatever apprehensions may have caused the *Burney* remand for consideration of the mootness issue, this court has had the opportunity to evaluate defendant's mootness arguments at the present time, and finds them without merit.

## IV.

As noted at the outset, plaintiffs challenge the "seated interview" system on two grounds: (1) that it fails to provide minimal Fourteenth Amendment due process; and (2) that it conflicts with the "payment when due" directive of § 303(a)(1) of the Social Security Act, 42 U.S.C. § 503(a)(1). Since any

the mootness issue. The Supreme Court affirmed on the statutory ground alone, and

never once intimated that the case might be moot.

discussion of these issues is dominated by the manner in which the Supreme Court has recently treated a series of similar cases, it is to that background that we now turn.

The starting point is the decision of a three-judge court in Torres v. New York State Department of Labor, 321 F.Supp. 432 (S.D.N.Y.1971), in which the New York practice of terminating unemployment benefits without a prior hearing was challenged. In a 2–1 decision, the court rejected the plaintiffs' Fourteenth Amendment claims, distinguishing Goldberg v. Kelly on the ground that it was a welfare case, hence involving "brutal need" and a special necessity for pretermination hearings. The court unanimously rejected the plaintiffs' statutory claim, reasoning that when a departmental employee had determined that a claimant is disqualified because of his inadequate efforts at finding work, it could not be said that payments are "due." The Torres court explicitly rejected the authority of Java v. California Department of Human Resources Development, 317 F.Supp. 875 (N.D.Cal. 1970), in which California unemployment compensation procedures were held in conflict with both the Fourteenth Amendment and the Social Security Act.[19] 321 F.Supp. at 438 n. 1.

An appeal followed, but before it was decided, the Supreme Court affirmed the judgment of the district court in *Java*, 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971). The Court held that the California scheme was in conflict with the "payment when due" provisions of § 303(a)(1), and thus did not reach the constitutional issue. Consequently, the Court remanded *Torres* to the three-judge court for further consideration in light of *Java*. 402 U.S. 968, 91 S.Ct. 1685, 29 L.Ed.2d 133 (1971).

On remand, the *Torres* three-judge court unanimously adhered to its former decision on the statutory point. 333 F. Supp. 341 (S.D.N.Y.1971). The *per cur-*

*iam* opinion noted that the California system attacked in *Java* involved automatic termination of unemployment benefits whenever an employer filed an appeal from an eligibility determination. The practice under challenge in New York, however, involved suspension of payments after an administrative determination of disqualification, which followed an interview with the claimant. The court reasoned that payments could not be said to be "due" in New York after an administrative official had made a determination that they were not. This was contrasted with the California system, where payments were automatically suspended upon an employer's appeal, even though an administrative official had in fact determined that the claimant was eligible, or put another way, that payments were "due." The *Torres* court adhered to its original decision on the constitutional issue, again splitting 2–1. *Id.* at 343.

A new appeal was filed. On February 28, 1972, the Supreme Court summarily affirmed, 405 U.S. 949, 92 S.Ct. 1185, 31 L.Ed.2d 228. No opinion was filed. Justices Douglas, Brennan and Marshall noted their dissents, simply stating that Goldberg v. Kelly required reversal.

This, however, was not the final chapter. In the period before the *Torres* affirmance, an Indiana three-judge court, facing issues seemingly identical to those in *Torres*, found Indiana procedures in conflict with § 303(a)(1) of the Act. Hiatt v. Indiana Employment Security Division, 347 F.Supp. 218 (N. D.Ind.1971). One of the *Hiatt* plaintiffs was in a factual situation identical to that in *Java*, and the state did not appeal as to him. The other plaintiff, however, had her benefits suspended not because of an employer's appeal, but for insufficient efforts to find work. The state appealed as to her. Instead of simply vacating the judgment on the basis of *Torres*, the Supreme Court noted probable jurisdiction sub nom. Indiana Employment Security Division v. Bur-

19. *See* note 18, *supra*.

ney, 406 U.S. 956, 92 S.Ct. 2058, 32 L. Ed.2d 342 (1972).

The *Torres* plaintiffs noted this apparent anomaly. Consequently, they filed a petition for rehearing, arguing that any decision on the statutory claim in *Burney* would necessarily control their case. *Inter alia*, the *Torres* plaintiffs also argued that the Supreme Court's decision in Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), which came after the *Torres* affirmance, undercut the district court's reliance upon "brutal need" as a prerequisite to due process claims, and hence necessitated a new look at the Fourteenth Amendment claim.

However, as noted above, the Court did not reach the merits in *Burney*, instead remanding the case for the district court to consider the issue of mootness. 409 U.S. 540, 93 S.Ct. 883, 35 L.Ed.2d 62 (1973). Justices Marshall and Brennan dissented, disagreeing with the mootness suggestion and arguing that Goldberg v. Kelly required affirmance.

Several months later, on March 5, 1973, the rehearing petition in *Torres* was denied, again without opinion. 410 U.S. 971, 93 S.Ct. 1446, 35 L.Ed.2d 707. Justice Marshall, joined by Justices Douglas and Brennan, dissented, outlining the prior history of *Torres* and *Burney* and complaining that the Court "finally disposes of important issues of constitutional law and statutory construction in a fashion which can only be characterized as bizarre." The three dissenters again noted their position that Goldberg v. Kelly required a prior hearing in these circumstances and argued that it was likely that *Java* required a finding of a statutory violation.

## V.

■ Were we writing on a somewhat cleaner slate, we would have little diffi-

culty in rejecting the reasoning of the district court in *Torres*, and concluding, largely for the reasons so ably set out by Judge Oakes in Wheeler v. State of Vermont, *supra*, that the Connecticut unemployment compensation procedures here challenged conflict with both the Fourteenth Amendment and the Social Security Act. *See also Crow, supra; Hiatt, supra; Java, supra*. But, such a course is not open to us. It is the law of this circuit that a summary affirmance by the Supreme Court is entitled to full precedential weight, Doe v. Hodgson, 478 F.2d 537, 539 (2d Cir. 1973), despite a number of suggestions elsewhere to the contrary. *See, e. g.*, Dillenburg v. Kramer, 469 F.2d 1222, 1225 (9th Cir. 1972); Serrano v. Priest, 5 Cal.3d 584, 96 Cal.Rptr. 601, 624, 487 P.2d 1241, 1264 & n. 35 (1971). *Cf*. Currie, The Three-Judge Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 74 n. 365 (1964).[20] As a district court sitting in the Second Circuit, we are bound by this rule. *See* Lewis v. Rockefeller, 431 F.2d 368, 371 (2d Cir. 1970).

Thus, the threshold question before us is whether the summary affirmance in *Torres* forecloses inquiry into the merits here. The state so argues, and draws at least inferential support from Mr. Justice Marshall's lament that denial of rehearing in *Torres* "finally disposes" of the relevant questions. But, there are at least several reasons for supposing that the important issues here cannot be disposed of simply through a citation to *Torres*. For one thing, there is the Supreme Court's noting of probable jurisdiction in *Burney*. That case involved issues seemingly identical to those in *Torres*. Since the noting of probable jurisdiction represents at least a preliminary conclusion by the Court that substantial issues are posed by an appeal, *cf.* Sugarman v. United States, 249 U.S. 182, 184, 39 S.Ct. 191, 63 L.Ed. 550

---

20. If nothing else, the procedural history outlined in part IV, supra, provides much ammunition to those who would abolish both the three-judge court requirement and direct appeal to the Supreme Court in constitution-
al cases. *See generally* Report of the Study Group on the Caseload of the Supreme Court 25–34 (1972). *Cf.* Roe v. Ingraham, 480 F.2d 102, 105 n. 4 (2d Cir. 1973) and sources cited therein.

(1919); Brolan v. United States, 236 U.S. 216, 218, 35 S.Ct. 285, 59 L.Ed. 544 (1915); R. Stern & E. Gressman, Supreme Court Practice 230–38, 356–60 (4th ed. 1969), this action in *Burney* must stand for the proposition that *Torres* does not absolutely foreclose inquiry into the area.

Moreover, a summary affirmance which, like that in *Torres*, recites no reasons or factual background, provides at least some difficulties in precedential interpretation. The affirmance is entitled to precedential weight, to be sure, but divining the precise content of the precedent remains difficult. In Doe v. Hodgson, *supra,* the Second Circuit resolved that dilemma by looking to the holdings in the district court below, and implicitly assuming acceptance of them by the Supreme Court. It would seem that the same course is mandated here, where the plaintiffs make serious claims that the case at hand is distinguishable, both factually and legally, from *Torres*.

■ Put another way, we view the summary affirmance in *Torres* as standing for the proposition that the Supreme Court at that time thought that the district court's application of the law to the particular facts presented was correct. Plaintiffs claim that the law has so evolved since *Torres,* and that the facts here are so different, that either of the two elements independently would justify a different result here. To evaluate that argument, we must necessarily focus on what the *Torres* court said, and how this case is alleged to differ.

### A.

Judge Hays' opinion for the three-judge court in *Torres* treated the constitutional issue in the following manner. The opinion began by noting that plaintiffs placed primary reliance on Goldberg v. Kelly. However, Judge Hays maintained, there was a crucial difference between *Goldberg* and the case at hand: *Goldberg* dealt with the issue of pre-termination hearings for welfare recipients. The three-judge court then quoted those portions of the *Goldberg* opinion which stressed this factor, and noted the "unique situation" and "brutal need" of those whose only source of sustenance is withdrawn. *See* 321 F. Supp. at 436 (quoting from 397 U.S. at 261, 90 S.Ct. 1011).

Judge Hays then noted that while need is a criterion for eligibility for the kind of welfare payments involved in *Goldberg,* unemployment compensation carries with it no needs test. *Id.* at 437. *See* S.Rep.No.628, 74th Cong., 1st Sess. 11 (1935); H.R.Rep.No.615, 74th Cong., 1st Sess. 7 (1935). Moreover, the claimant denied unemployment benefits in New York could qualify for welfare, if the requisite need were shown.

"Thus the worst possible effect of the procedure which plaintiffs attack as being lacking in due process would be that for a period of a few weeks until a hearing is held a claimant who is finally determined to be eligible for payments would have to live on his accumulated savings or, if he had no savings, would have to resort to relief." 321 F.Supp. at 437.

The opinion then went on to maintain, quoting from Escalera v. New York City Housing Authority, 425 F.2d 853, 867 (2d Cir.), cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970), that

"The minimum procedural requirements of due process under the Fourteenth Amendment must reflect the balance between the government's interest in efficient administration and the nature of the individual's interest being affected by governmental action." 321 F.Supp. at 437.

The governmental interests involved in *Torres* were seen to be those involved in making accurate eligibility determinations without undue pressures of speed, and the difficulties in recouping amounts erroneously paid out. The district court majority saw these interests as outweighing the interests of the individuals involved, since it defined the latter as the possibility that a claimant might have to live off his savings or

welfare for the "few weeks" between termination and a full hearing. These individual stakes were viewed as much less momentous than those presented by the "brutal need" situation in *Goldberg*.

Plaintiffs have directed two lines of attack at the *Torres* opinion, and derivatively, at the summary affirmance. Their first point is that Supreme Court decisions since the *Torres* affirmance have discredited the district court's due process analysis, and thus the summary affirmance is no longer good law. This argument finds some succor in Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). There, in striking down prejudgment replevin law as violative of due process, the Court labeled as "narrow" any reading of *Goldberg* that stressed the "necessary" nature of welfare benefits. *Id.* at 88–90, 92 S.Ct. 1983. While such factors might be relevant to the *form* of due process hearing, *id.* at 89 n. 20, 92 S.Ct. 1983, the Court emphasized that the Fourteenth Amendment required some sort of notice and hearing before deprivation of all but *de minimis* property interests. *Id.* at 90 & n. 21, 92 S.Ct. 1983.

Plaintiffs seize upon this language and that in more recent Supreme Court decisions, *e. g.*, Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) and contend that the *Torres* due process rationale is no longer viable, if indeed it ever was. Consequently, they ask us to hold that we are not at all bound by the *Torres* due process holding.

While it does seem clear to us that cases subsequent to the *Torres* affirmance have made it clear that *Goldberg's* scope is not confined to deprivations of "necessary property" which result in "brutal need," we do not view this "change of law" as sufficient reason, in and of itself, to ignore the *Torres* holding. This decision is man-

dated by the Second Circuit's opinion in Doe v. Hodgson, *supra*. There, the panel noted that under recent trends in equal protection law, the Supreme Court's decision in Romero v. Hodgson, 403 U.S. 901, 91 S.Ct. 2215, 29 L.Ed.2d 678 (1971), was open to serious attack. Nonetheless, the appellants were told that any further pronouncements on the subject would have to come from the Supreme Court. 478 F.2d 537, at 540. Thus, even assuming *arguendo* that recent due process developments undercut the *Torres* rationale, the Second Circuit's decision forecloses us from avoiding *Torres* on that ground alone.

Nonetheless, we are persuaded by plaintiffs' second argument that the *Torres* affirmance does not foreclose the claims made here. As noted above, in deciding exactly what sort of procedures were mandated by the due process clause in the *Torres* situation, Judge Hays found that the claimant's interests were measured by the possibility that he might have to live off his savings or welfare in the "few weeks" between termination and a full hearing. Those interests were found not to outweigh the governmental interest in accurate and unhurried determinations of eligibility, and the difficulties inherent in recouping mistaken payments. Plaintiffs here argue that, even assuming *arguendo* the correctness of the *Torres* balancing, the factual situation of the Connecticut claimant is sufficiently different from that of the New Yorker to require a different result.

In *Torres*, the record indicated that the average disputed compensation case took 45 days for determination. 321 F. Supp. at 439 (Lasker, J., dissenting). This period, then, is the "few weeks" during which the terminated New York claimant might have to rely upon savings or welfare, while awaiting his hearing on the merits of the termination issue. Even if the "briefness" of this period cut against the *Torres* plaintiffs'

due process point,[21] it is abundantly clear that the relevant delays in Connecticut are far longer. The record indicates that of the 461 intrastate appeals disposed of in Connecticut during December of 1972, fully 414 took at least 101 days between the time an appeal was filed and the date a final decision was reached. Put in percentage terms, this means that about 89.8% of all appeals took over 100 days to decide. And, the figures indicate that 61.4% of all appeals take over 125 days to dispose of, while 29.5% consumed over 150 days before the Commissioner's decision.[22] Figures from other months strongly suggest that the December figures are not unrepresentative.[23]

It may be one thing to find the claimant's due process claims insufficient in New York, where 45 days are consumed awaiting a decision in the average appeal, but it is quite another to do so in Connecticut, where the average delay is well over 126 days, or 18 weeks. And, while New York had Aid for Dependent Children programs available for those struck by "brutal need" during the 45-day period, Connecticut, with its substantially longer delays, does not participate in the Aid for Dependent Children-Unemployed Parents program.[24] If the appropriate weighing of governmental interests against those of the individual is really a case by case process, see Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), it seems patent that the results of the weighing process employed in *Torres* are inapplicable here. We thus hold that the *Torres* affirmance does not foreclose our independent appraisal of the merits of plaintiffs' constitutional claim.

■ On the merits of that due process claim, recent Supreme Court decisions seem to mandate a two-part inquiry. The first question is whether plaintiffs here have a sufficient "property" interest in receipt of unemployment compensation to trigger Fourteenth Amendment due process requirements. *See generally* Board of Regents v. Roth, *supra*, 408 U.S. at 576–579, 92

---

21. *Compare Wheeler, supra,* 335 F.Supp. at 861, where Judge Oakes viewed a five-week delay as "unreasonable."

22. The above figures derive from an exhibit prepared by plaintiffs after detailed examination of Unemployment Compensation Commission records. Their accuracy is not challenged by the defendant Administrator. The figures cover the 461 intrastate appeals disposed of by written decision in December, 1972; interstate appeals, which involve obtaining work and wage records from the state of the claimant's prior residence, were not included, as they generally involve even longer delays.
The aggregate figures are as follows:

| Days Between Filing of Appeal and Commissioner's Decision | Number of Appeals In Category | Percentage of Total |
|---|---|---|
| 0–30 | 1 | .2% |
| 31–45 | 2 | .4% |
| 46–75 | 9 | 2.0% |
| 76–100 | 35 | 7.6% |
| 101–125 | 131 | 28.4% |
| 126–150 | 147 | 31.9% |
| Over 151 | 136 | 29.5% |
|  | 461 |  |

23. The state Labor Department must submit a "Form ES–221" entitled "Benefit Appeals" to the United States Department of Labor on a monthly basis. That form provides information about the time lapse between the date of filing an appeal and the date of mailing the Commissioner's decision. The time lapses are broken into four categories: 0–30 days, 31–45 days, 46–75 days, and over 75 days. (Compare the more detailed breakdown for December, 1972, in note 22, *supra*). The following table represents the figures presented for intrastate appeals in the three most recent months, for which data was submitted.

| Number of Days | March, 1973 | February, 1973 | January, 1973 |
|---|---|---|---|
| 0–30 | 3 | 0 | 0 |
| 31–45 | 4 | 1 | 0 |
| 46–75 | 2 | 6 | 3 |
| Over 75 | 676 | 521 | 503 |
| Total | 685 | 528 | 506 |

24. Connecticut does, however, have a system of "town" assistance. Conn.Gen.Stat. § 17–272 et seq.

S.Ct. 2701; Perry v. Sindermann, *supra,* 408 U.S. at 599–603, 92 S.Ct. 2694. It seems clear to us that such a "property" interest is present here. The Supreme Court has "made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." *Roth, supra,* 408 U.S. at 571–572, 92 S. Ct. at 2706. The Court recently characterized Goldberg v. Kelly as standing for the proposition that

> "[A] person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process." *Roth, supra* at 576, 92 S.Ct. at 2708.

That being the case, it follows *a fortiori* that one who has been receiving unemployment benefits under identical conditions has a similar "property" interest. *See also Fuentes, supra,* 407 U.S. at 88–90, 92 S.Ct. 1983. It makes little difference to contend, as the defendant does here, that those who fail the "seated interview" test are not entitled to benefits, and hence do not have "property" interests. As in *Goldberg,* that entitlement is precisely what is at issue, and the "property" interest cannot be terminated or suspended without Fourteenth Amendment due process.

The second part of the inquiry is what form of procedural due process is necessary to protect the particular "property" interest involved. *Fuentes, supra,* 407 U.S. at 90 n. 21, 92 S.Ct. 1983; *Goldberg, supra.* The defendant Administrator argues that the "seated interview" satisfies minimal due process standards. He contends that the large bulk of disqualifying information is provided by the claimants themselves; he distinguishes Goldberg v. Kelly on the ground that the claimant here at least has an opportunity to argue his case to the fact finding examiner. Finally, it is claimed that, in the absence of *Goldberg* "brutal need," the informal system here conforms with Fourteenth Amendment requirements.

Even accepting *arguendo* defendant's arguments about the absence of "need" among unemployment compensation claimants, and noting the ability of plaintiffs here to at least confront the decision maker, we still think it clear that the "seated interview" system does not provide sufficient procedural due process. Claimants are provided with virtually no advance notice of the interview, or the precise issues involved, and consequently have no opportunity to either prepare their arguments or present witnesses on their behalf. No opportunity is presented to confront adverse witnesses; no opportunity is provided to consult with counsel. The fact finding examiner may go beyond the record of the "seated interview" in making his decision; when that decision is made, the only explanation a claimant receives is a perfunctory citation to a statutory section concerning disqualification. *Compare* Goldberg v. Kelly, *supra,* 397 U.S. at 266–271, 90 S.Ct. 1011.[25]

---

25. To be sure, the claimant has somewhat constructive notice that, on bi-weekly occasions, he may be asked to undergo a "seated interview" and satisfy the examiner as to his efforts and availability for work. But, even leaving aside the problem that notice alone cannot replace the meaningful opportunity to present evidence, *cf.* Wheeler v. Montgomery, 397 U.S. 280, 90 S.Ct. 1026, 25 L.Ed.2d 307 (1970), several difficulties remain. The claimant surely cannot be expected to bring counsel and witnesses to every bi-weekly claims session, on the off chance that a "seated interview" will result. Nor can the claimant be certain in advance of the subject matter of the interview. While questions involving reasonable efforts at finding work are most common, "seated interviews" can and do involve numerous other grounds for possible disqualification. *Cf.* Conn.Gen.Stat. § 31–236 & n.7 *supra.*

It might also be noted that the record discloses some uncertainty about the standard against which "reasonableness" is measured. Theodore Hatcher, Unemployment Compensation Director for Connecticut, testified that there is an informal rule of thumb that the claimant must list at least three places at which he has sought employment a week on his U.C.–45. In response to a question

To be sure, due process requires something less in this context than a full-blown trial. Indeed, it might even be that differences in "need" requirements between welfare and unemployment benefits could justify somewhat less comprehensive procedures here than were required in *Goldberg*.[26] But, whatever the minimal requirements of Fourteenth Amendment due process in this context, the "seated interview" system does not provide them. At the very least, claimants are entitled to some advance notice of the hearing and precise issues to be considered, with the concomitant opportunity to present evidence and bring counsel.[27] Of course, formulation of an appropriate system is in the first instance a responsibility of the defendant Administrator. But when an administrator is making as subjective a determination as one involving "reasonable

efforts" at finding work, the procedures adopted must at least allow the claimant opportunity to fairly and completely present his side of the case, and to meet any unfavorable evidence. This the present system does not do.

### B.

■ With regard to the statutory question, plaintiffs have made a number of arguments designed to distinguish *Torres* and avoid the force of the Supreme Court's summary affirmance. First, they point to the differences, outlined above, between the time periods a claimant encounters in New York and Connecticut while waiting for his appeal to be decided. Secondly, they present statistics showing that a significant number of claimant appeals result in reversals of the original disqualification decision, a factor apparently not taken into account by the *Torres* court.[28] *Com-*

---

from this court, Mr. Hatcher said that claimants were advised of this rule at their benefit rights interview. However, Eleanor H. Smarz, manager of the Bridgeport Unemployment Compensation office, responded to a question about whether claimants were told of the "rule of thumb" by stating:

. "It was not an official notification that they were to tell these people, if that is what happened. But this is, there's no official number or anything in reference to this."

Thus, serious questions arise about whether a claimant can ever meet a burden of proof based on a "rule of thumb" that he has never heard of. Indeed, even Mr. Hatcher conceded that in "crash periods" not everyone receives a benefit rights interview, at which the information is supposedly imparted.

26. Of course, even if "need" is not a prerequisite to eligibility for unemployment benefits, it does not necessarily follow that the average claimant is not in need. *See generally Java, supra*, 402 U.S. at 130, 91 S.Ct. at 1353:

"A kind of 'need' is present in the statutory scheme for insurance, however, to the extent that any 'salary replacement' insurance fulfills a need caused by lost employment."

And *id.* at 131–132, 91 S.Ct. at 1354:

"Unemployment benefits provide cash to a newly unemployed worker 'at a time when otherwise he would have nothing to spend,' serving to maintain the recipient at subsistence levels without the necessity

of his turning to welfare or private charity." (footnote omitted)

Recent statistics suggest that the average unemployment compensation recipient is hardly well-off. In 1970, the average wage covered by unemployment insurance in the United States was $141.09; in Connecticut, it was $149.76. The average weekly benefit in that year in the United States was $50.31, or 35.7% of the average covered wage; in Connecticut, it was $60.26, or 40.2% of the wage. United States Department of Labor, Handbook of Unemployment Insurance Financial Data 1938–1970 at 139 (1971). Other studies suggest that the average claimant is often in dire straits. *See generally* Motion for Permission to File Brief Amici Curiae and Brief Amici Curiae of National Employment Law Project, et al., in Indiana Employment Security Division v. Burney, and sources cited therein.

27. Of course, the defendant may simply choose not to have a preliminary hearing at all, and allow benefits to be paid pending the full hearing before the Commissioner. *See* Goldberg v. Kelly, 397 U.S. at 267 n.14, 90 S.Ct. 1011. That choice, however, is up to the state, particularly in light of possible difficulties in recouping benefits erroneously paid during the period before a hearing is held.

28. The statistics are derived from the "Form ES–221" *see* note 23, *supra*. One portion of that form breaks down the monthly total of appeals decisions into those appeals taken by

*pare Crow, supra,* 325 F.Supp. at 1318 & n. 2 (noting that 32% of those eventually receiving full hearings are found eligible).

Taking these facts together, plaintiffs argue that even if the New York system could be seen as providing payments "when due," the Connecticut procedure, with its lengthier delays and large reversal rate, presents a different problem. In the abstract, the argument has much force. If the purpose of unemployment compensation really is "salary replacement" and providing benefits to the worker as close to the date of unemployment as possible, *see Java, supra,* 402 U.S. at 129–133, 91 S.Ct. 1347, it would seem that a system that makes large numbers of those with valid claims wait on the average of over 100 days before allowing them benefits conflicts seriously with the statutory objectives.

But for us to accept the statutory challenge being made here would be to disregard what occurred in *Torres.* As will be remembered, the original judgment of the *Torres* court was vacated and remanded for consideration in light of *Java.* 402 U.S. 968, 91 S.Ct. 1685, 29 L.Ed.2d 133 (1971). With its attention thus focused on the statutory issue, the *Torres* court nonetheless adhered to its original decision. 333 F.Supp. 341 (S.D. N.Y.1971). It distinguished *Java* because that case had involved the automatic suspension of benefits upon the taking of an appeal by the employer. The court then met the "when due" problem with a holding that had nothing to do with either average delay periods or reversal rates. Quite simply, the *per curiam* opinion stated that, because of the administrative determination made at the interview of the claimant, it simply could not be said that payments were "due." The court stressed the fact that

the administrative determination was made on the basis of facts not previously available. It was this opinion that the Supreme Court summarily affirmed.

The summary affirmance would thus seem to stand for the proposition that payments are not "due" until a hearing is held and someone says they are. In that case, the factual distinctions offered by plaintiffs here are of no avail, and we would seem to be bound by the *Torres* affirmance to reject the statutory argument.

To be sure, the Supreme Court did note probable jurisdiction in *Burney,* a case decided solely upon statutory grounds below. But we are still left with three key facts: (1) the Supreme Court remanded *Torres* for reconsideration on the statutory grounds; (2) the district court responded with a theory which, if accepted, would foreclose the claims made here, and, (3) the Supreme Court summarily affirmed. In light of that scenario, we are not free to decide the issues *de novo. Burney* may well evidence the Court's own willingness to clarify or distinguish *Torres,* but until such a step is forthcoming, we are bound by that case's rejection of the arguments put forth here.

## VI.

■■■ While we find that the state's procedure for terminating unemployment compensation benefits are lacking in due process in a number of respects, we note that conforming to the requirements of due process will not necessarily require the remedying of every deficiency. Essentially, we find due process lacking because (a) a property interest has been denied (b) at an inadequate hearing (c) that is not reviewable

claimants, and those decided in favor of claimants. For the period of July, 1971, to June, 1972, there were 6534 claimant appeals, and 1706 of these were resolved in favor of claimants, for a reversal figure of about 26.1%. In the period from July, 1972, to October, 1972, there were 769 reversals out of 2959 claimant appeals, or about 26.0%. In the three-month period from January, 1973, through March, 1973, there were 1759 claimant appeals, and 342 reversals, or a rate of about 19.4%.

**938**

*de novo* until an unreasonable length of time. The state thus has three areas in which to make improvements. For some cases, it can provide for an expedited hearing *de novo*. For others, it can bring the initial hearing procedures up to a minimum standard of fairness. In this regard, essential fairness can be expeditiously achieved in some instances by setting forth and communicating to claimants in advance a quantifiable standard concerning reasonable effort to find employment.[29] For example, if a stated number of employers must be visited, a claimant's acknowledgment that he had seen fewer than the required number would eliminate the factual controversy and provide an adequate basis for denial of benefits. Finally, in those cases where proper hearings or reasonably prompt *de novo* review are for some reason burdensome, the state can always consider paying the benefit for the disputed week, reserving the right to set off that week's payment against a future week's benefit once the proper procedure for an adverse determination has finally been followed. Of course, the choice of methods to bring its procedures into compliance with the Due Process Clause rests with the state.

In summary, then, we find that the "seated interview" system as currently used for terminating or suspending the payment of unemployment compensation benefits does not provide minimal due process under the Fourteenth Amendment to the Constitution. We accordingly enjoin the defendant Administrator, his successors in office, agents, and employees from administering Chapter 567, Conn.Gen.Stat. (§ 31–222 et seq.) in such a manner as to deprive members of the plaintiff class of unemployment benefits without first according them a constitutionally sufficient prior hearing.

This opinion shall serve as the court's findings of fact and conclusions of law, under Fed.R.Civ.P. 52(a).

---

29. While the record discloses some evidence of a quantified standard, it is not clear that this standard is communicated to claimants, or even that all administrators are aware of it. *See* footnote 25, *supra.*