**BARNETTE et al. v. WEST VIRGINIA STATE BOARD OF EDUCATION et al.**

No. 242.

District Court, S. D. West Virginia.

Oct. 6, 1942.

Hayden C. Covington, of Brooklyn, N. Y., and Horace S. Meldahl, of Charleston, W. Va., for plaintiffs.

William S. Wysong, Atty. Gen. of West Virginia, and Ira J. Partlow, Asst. Atty. Gen. of West Virginia, for defendants.

Before PARKER, Circuit Judge, and HARRY E. WATKINS and MOORE, District Judges.

PARKER, Circuit Judge.

This is a suit by three persons belonging to the sect known as "Jehovah's Witnesses", who have children attending the public schools of West Virginia, against the Board of Education of that state. It is brought by plaintiffs in behalf of themselves and their children and all other persons in the State of West Virginia in like situation, and its purpose is to secure an injunction restraining the State Board of Education from enforcing against them a regulation of the Board requiring children in the public schools to salute the American flag. They allege that they and their children and other persons belonging to the sect of "Jehovah's Witnesses" believe that a flag salute of the kind required by the Board is a violation of the second commandment of the Decalogue, as contained in the 20th chapter of the Book of Exodus; that be-cause of this belief they cannot comply with the regulation of the Board; that, if they fail to comply, the children will be expelled from school, and thus be deprived of the benefits of the state's public school system; and that plaintiffs, in such event, will have to provide them education in private schools at great expense or be subjected to prosecution for crime for failing to send them to school, as required by the compulsory school attendance law of the state. They contend, therefore, that the regulation amounts to a denial of religious liberty and is violative of rights which the first amendment to the federal Constitution protects against impairment by the federal government and which the 14th Amendment protects against impairment by the states.

A motion has been made to dismiss the bill on the ground that the regulation of the Board is a proper exercise of power vested in it by the State of West Virginia, and that, under the doctrine of Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375, 127 A.L.R. 1493, the flag salute which it requires cannot be held a violation of the religious rights of plaintiffs. The case was heard on application for interlocutory injunction; but the parties have agreed that it be submitted for final decree on the bill and motion to dismiss. No question is raised as to jurisdiction; and it appears from the face of the bill that the case is one arising under the Constitution of the United States involving, as to each plaintiff, a sum in excess of $3,000, since it is alleged that each of plaintiffs would be required to incur expense in excess of that amount if their children should be excluded from the public schools. And it seems clear that there is jurisdiction, irrespective of the amount involved, since the suit is for the protection of rights and privileges guaranteed by the due process clause of the 14th Amendment, and jurisdiction is given by Judicial Code § 24(14), 28 U.S.C.A. § 41(14). Hague v. C. I. O., 307 U.S. 496, 525, 59 S.Ct. 954, 83 L.Ed. 1423. There is, therefore, but one question for our decision, viz.: Whether children who for religious reasons have conscientious scruples against saluting the flag of the country can lawfully be required to salute it. We think that this question must be answered in the negative.

Ordinarily we would feel constrained to follow an unreversed decision of the Supreme Court of the United States,

whether we agreed with it or not. It is true that decisions are but evidences of the law and not the law itself; but the decisions of the Supreme Court must be accepted by the lower courts as binding upon them if any orderly administration of justice is to be attained. The developments with respect to the Gobitis case, however, are such that we do not feel that it is incumbent upon us to accept it as binding authority. Of the seven justices now members of the Supreme Court who participated in that decision, four have given public expression to the view that it is unsound, the present Chief Justice in his dissenting opinion rendered therein and three other justices in a special dissenting opinion in Jones v. City of Opelika, 316 U.S. 584, 62 S.Ct. 1231, 1251, 86 L.Ed. 1691. The majority of the court in Jones v. City of Opelika, moreover, thought it worth while to distinguish the decision in the Gobitis case, instead of relying upon it as supporting authority. Under such circumstances and believing, as we do, that the flag salute here required is violative of religious liberty when required of persons holding the religious views of plaintiffs, we feel that we would be recreant to our duty as judges, if through a blind following of a decision which the Supreme Court itself has thus impaired as an authority, we should deny protection to rights which we regard as among the most sacred of those protected by constitutional guaranties.

 There is, of course, nothing improper in requiring a flag salute in the schools. On the contrary, we regard it as a highly desirable ceremony calculated to inspire in the pupils a proper love of country and reverence for its institutions. And, from our point of view, we see nothing in the salute which could reasonably be held a violation of any of the commandments in the Bible or of any of the duties owing by man to his Maker. But this is not the question before us. Admittedly plaintiffs and their children do have conscientious scruples, whether reasonable or not, against saluting the flag, and these scruples are based on religious grounds. If they are required to salute the flag, or are denied rights or privileges which belong to them as citizens because they fail to salute it, they are unquestionably denied that religious freedom which the Constitution guarantees. The right of religious freedom embraces not only the right to worship God according to the dictates of one's conscience, but also the right "to do, or forbear to do, any act, for conscience sake, the doing or forbearing of which, is not prejudicial to the public weal". Chief Justice Gibson in Commonwealth v. Lesher, 17 Serg. & R., Pa., 155.

 Courts may decide whether the public welfare is jeopardized by acts done or omitted because of religious belief; but they have nothing to do with determining the reasonableness of the belief. That is necessarily a matter of individual conscience. There is hardly a group of religious people to be found in the world who do not hold to beliefs and regard practices as important which seem utterly foolish and lacking in reason to others equally wise and religious; and for the courts to attempt to distinguish between religious beliefs or practices on the ground that they are reasonable or unreasonable would be for them to embark upon a hopeless undertaking and one which would inevitably result in the end of religious liberty. There is not a religious persecution in history that was not justified in the eyes of those engaging in it on the ground that it was reasonable and right and that the persons whose practices were suppressed were guilty of stubborn folly hurtful to the general welfare. The fathers of this country were familiar with persecution of this character; and one of their chief purposes in leaving friends and kindred and settling here was to establish a nation in which every man might worship God in accordance with the dictates of his own conscience and without interference from those who might not agree with him. The religious freedom guaranteed by the 1st and 14th Amendments means that he shall have the right to do this, whether his belief is reasonable or not, without interference from anyone, so long as his action or refusal to act is not directly harmful to the society of which he forms a part.

 This does not mean, of course, that what a man may do or refrain from doing in the name of religious liberty is without limitations. He must render to Caesar the things that are Caesar's as well as to God the things that are God's. He may not refuse to bear arms or pay taxes because of religious scruples, nor may he engage in polygamy or any other practice directly hurtful to the safety, morals, health or general welfare of the community. See cases cited in Minersville School District v. Gobitis, 3 Cir. 108 F.2d 683, 689. To

justify the overriding of religious scruples, however, there must be a clear justification therefor in the necessities of national or community life. Like the right of free speech, it is not to be overborne by the police power, unless its exercise presents a clear and present danger to the community. Cf. Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 739, 81 L.Ed. 1066, where it was said: "The power of a state to abridge freedom of speech and of assembly is the exception rather than the rule and the penalizing even of utterances of a defined character must find its justification in a reasonable apprehension of danger to organized government. The judgment of the Legislature is not unfettered. The limitation upon individual liberty must have appropriate relation to the safety of the state." Religious freedom is no less sacred or important to the future of the Republic than freedom of speech; and if speech tending to the overthrow of the government but not constituting a clear and present danger may not be forbidden because of the guaranty of free speech, it is difficult to see how it can be held that conscientious scruples against giving a flag salute must give way to an educational policy having only indirect relation, at most, to the public safety. Surely, it cannot be that the nation is endangered more by the refusal of school children, for religious reasons, to salute the flag than by the advocacy on the part of grown men of doctrines which tend towards the overthrow of the government.

█ The suggestion that the courts are precluded by the action of state legislative authorities in deciding when rights of religious freedom must yield to the exercise of the police power would, of course, nullify the constitutional guaranty. It would not be worth the paper it is written on, if no legislature or school board were bound to respect it except in so far as it might accord with the policy they might choose to follow. For the courts to so hold would be for them to abdicate the most important duty which rests on them under the Constitution. The tyranny of majorities over the rights of individuals or helpless minorities has always been recognized as one of the great dangers of popular government. The fathers sought to guard against this danger by writing into the Constitution a bill of rights guaranteeing to every individual certain fundamental liberties, of which he might not be deprived by any exercise whatever of governmental power.

This bill of rights is not a mere guide for the exercise of legislative discretion. It is a part of the fundamental law of the land, and is to be enforced as such by the courts. If legislation or regulations of boards conflict with it, they must give way; for the fundamental law is of superior obligation. It is true of freedom of religion, as was said of freedom of speech in Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 151, 84 L.Ed. 155: "In every case, therefore, where legislative abridgment of the rights is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights."

Can it be said by the Court, then, in the exercise of the duty to examine the regulation here in question, that the requirement that school children salute the flag has such direct relation to the safety of the state, that the conscientious objections of plaintiffs must give way to it? Or to phrase the matter differently, must the religious freedom of plaintiffs give way because there is a clear and present danger to the state if these school children do not salute the flag, as they are required to do? It seems to us that to ask these questions is to answer them, and to answer them in the negative. As fine a ceremony as the flag salute is, it can have at most only an indirect influence on the national safety; and no clear and present danger will result to anyone if the children of this sect are allowed to refrain from saluting because of their conscientious scruples, however groundless we may personally think these scruples to be. It certainly cannot strengthen the Republic, or help the state in any way, to require persons to give a salute which they have conscientious scruples against giving, or to deprive them of an education because they refuse to give it. As was well said by Justice Lehman of New York in his concurring opinion in People v. Sandstrom, 279 N.Y. 523, 18 N.E.2d 840, 847: "The salute of the flag is a gesture of love and respect—

fine when there is real love and respect back of the gesture. The flag is dishonored by a salute by a child in reluctant and terrified obedience to a command of secular authority which clashes with the dictates of conscience".

The salute to the flag is an expression of the homage of the soul. To force it upon one who has conscientious scruples against giving it, is petty tyranny unworthy of the spirit of this Republic and forbidden, we think, by the fundamental law. This court will not countenance such tyranny but will use the power at its command to see that rights guaranteed by the fundamental law are respected. We are not impressed by the argument that the powers of the School Board are limited by reason of the passage of the joint resolution of June 22, 1942, pertaining to the use and display of the flag; but we are clearly of opinion that the regulation of the Board requiring that school children salute the flag is void in so far as it applies to children having conscientious scruples against giving such salute and that, as to them, its enforcement should be enjoined. Injunctive order will issue accordingly.

Injunction granted.