OPINION OF THE COURT
Kathryn McDonald, J.
This consolidated proceeding is before the court in a somewhat complex procedural posture. There are three separate matters: a petition filed by New York Foundling Hospital (hereafter NYFH or the agency) pursuant to section 384-b of the Social Services Law seeking termination of parental rights and a transfer of custody and guardianship to NYFH; a petition filed by the Commissioner of Social Services (CSS) pursuant to section 1055 of the Family Court Act seeking an extension of this court’s original placement order entered in the course of a prior article 10 of the Social Services Law neglect proceeding; and a petition in the form of a writ of habeas corpus filed by the natural father seeking return of the children to his custody. All three petitions were consolidated, and a hearing was held on October 19 and 20 and concluded on October 25, 1978. Counsel were requested to submit post-trial memoranda in lieu of oral summations; the last was received on December 22, 1978.
The facts are uncontested unless otherwise noted.
The natural parents, William R. and Maria O., never married but lived together from 1967 to 1974, during which time three children were born: Yvonne, on October 23, 1968; Gladys, on June 9, 1970; and William, on April 20, 1973. In August, 1974, after many earlier criminal convictions, the natural father was convicted on drug charges and sentenced to prison for a two-year-to-life sentence. He was imprisoned until September, 1977.
*429 In 1975, the natural mother voluntarily placed Gladys, who suffers from severe physical and mental handicaps, in temporary foster care. In 1976, the mother abandoned the two other children and on December 7, 1976, the Family Court placed them in the CSS’s custody for 18 months.
During his entire imprisonment Mr. R. (whose whereabouts were then unknown) made no attempt to stay in touch with his family, and he testified he heard nothing from Maria O. Only after the agency, through its own diligent efforts, located him in Greenhaven Correctional Facility in August, 1977, did Mr. R. learn of the children’s foster care placements; immediately after being paroled, in September, 1977, he visited the agency (with Maria O., who reappeared briefly, and subsequently disappeared again) to seek custody or visitation.
The three children, meanwhile, had lived in separate foster homes and facilities until summer, 1977. The foster parents, Barbara and Frank C., had asked the agency for a handicapped child to adopt in 1976. After Gladys had been placed in their home for some two months, the C.’s requested that Yvonne and William join her; the children were reunited in September, 1977 for the first time since 1975.
In October, 1977 the agency denied Mr. R.’s requests for custody or visitation, and he began legal proceedings to protect his rights. On December 1, 1977 he was adjudicated the legal father, and, by agreement among counsel he had two visits with the children, the first in December, 1977 and the second in February, 1978. Only the oldest child, Yvonne, had any recollection of her father, William having been only one year old when Mr. R. was imprisoned, and Gladys being mentally incapacitated. Visits were discontinued when Yvonne and William became upset by them.
When these proceedings came to trial in October, 1978, Mr. R. was unemployed, on parole, and living on public assistance with a Ms. S., a woman he had known less than a year, who was expecting his child in December, 1978. Ms. S. never appeared at trial.
The foster parents, the C.’s, live with the three children in a three bedroom suburban garden apartment. Mr. C. is employed as a maintenance man; Mrs. C. is a full-time housewife.
The foregoing constitutes the basic factual background underlying the legal disputes. Other pertinent details are addressed in subsequent portions of this decision. The court now *430 turns to an examination of the petitions before it, and to an analysis of the parties’ legal contentions.
THE GUARDIANSHIP PETITION
At the outset of the hearing, the agency presented its evidence of abandonment by the natural mother, the only named respondent on the petition, who failed to appear at the hearing and whose whereabouts are unknown. At the conclusion of the hearing the court found, by a fair preponderance of the evidence, that the natural mother, Maria O., abandoned her three children; in that since May, 1976, she failed to visit or communicate with them; that her only contact with the agency during this entire period consisted of two brief meetings with an agency caseworker on September 29, 1977 and October 14, 1977 when she was brought to the agency’s office by Mr. R; that those two agency contacts (not, note, contacts with her children) are insufficient to preclude a finding that Maria O. has otherwise evinced an unmistakable intent to forego her parental rights and obligations in a manner which manifestly rises to the level of abandonment as that term is set forth in section 384-b of the Social Services Law.[1]
Accordingly, on the basis of these findings the court adjudicated these children to be "abandoned” pursuant to subdivision 5 of section 384-b of the Social Services Law by their natural mother, Maria O.
Having made a fact finding adverse to the respondent parent in a petition under section 384-b of the Social Services Law, the court would ordinarily proceed to a dispositonal hearing to determine whether it is in the children’s best interests to sever the parental tie and free the child for adoption by transferring guardianship to the commissioner. Here, however, the intervening presence of the natural father, who is not named as a respondent on this petition and whose unfitness on specific statutory grounds is not alleged, raises a question of constitutional dimension which necessitates close scrutiny.
From the outset of this proceeding it has been the agency’s position that it need not allege nor prove statutory grounds of unfitness with regard to a natural father, such as Mr. R, who has been adjudicated the legal father of the children but who *431 never married the children’s mother. This view flows principally from the structure and statutory language of subdivision 2 of section 384-c of the Social Services Law which provides for notice to "any person adjudicated by a court in this state to be the father of the child” who is the subject of a proceeding initiated pursuant to section 384-b of the Social Services Law. Subdivision 3 of section 384-c specifically states that, "[t]he sole purpose of notice under this section shall be to enable the person served * * * to present evidence to the court relevant to the best interests of the child.” The clear implication of the text is that the agency need not name an unwed father as a respondent, nor prove his unfitness as a parent on statutory grounds, regardless of whether, as here, he has acquired the status of a legal father through an order of filiation.
This same distinction and concomitant limitation on the parental rights of an adjudicated but unwed father is even more manifest in the closely related sections 111 and 111-a of the Domestic Relations Law regarding the rights of unwed fathers in adoption proceedings. Section 111 of the Domestic Relations Law requires the consent "(b) Of the parents or surviving parent, whether adult or infant, of a child born in wedlock; (c) Of the mother, whether adult or infant, of a child born out of wedlock” (emphasis added) but conspicuously fails to require the consent of an unwed natural father. The Court of Appeals has upheld the constitutionality of this provision stating that such distinctions between wed and unwed fathers and unwed mothers and fathers do not violate the equal protection guarantees of the State or Federal Constitutions. (Matter of Malpica-Orsini, 36 NY2d 568.) In the case at bar, the agency and the CSS underscore the Orsini decision as dispositive and controlling while, on the other hand, counsel for the natural father urges this court to reject Orsini and strike down section 111 of the Domestic Relations Law as violative of the equal protection clause of the Federal Constitution’s Fourteenth Amendment.
Orsini is not a narrowly written decision; rather, it is a broad discussion and consideration of the distinction between wed and unwed fathers inherent in section 111 of the Domestic Relations Law and ultimately, an equally broad judicial indorsement of this statutory scheme as constitutionally sound. This court respectfully disagrees with the analysis and conclusion set forth by the Orsini majority, primarily for the *432 reasons cogently articulated by Judge Jones in his dissent. (Matter of Malpica-Orsini, supra, pp 578-592.) Nonetheless, the court is fully cognizant of the binding effect to be given a Court of Appeals holding by trial courts, and ordinarily, after duly noting its disagreement, this tribunal would proceed to apply the rule of law enunciated by the Court of Appeals. These, however, are not ordinary circumstances.
The rule as to the rights granted by New York State statutes to unwed fathers when their children are to be freed for adoption is currently under scrutiny by the United States Supreme Court. (Caban v Mohammed, 441 US 380.) A decision may be expected within weeks, not later than the end of the current term, unless reargument is scheduled. After noting the slow yet steady clarification of the parameters of the rights of unwed fathers, and the dimensions of the particular case sub judice, this trial court cannot, in conscience, blindly enforce the New York Court of Appeals rulings in Orsini and Caban (43 NY2d 708). Neither will the court presume to anticipate the Supreme Court’s ultimate decision on the merits. Rather, this court respectfully declares its intention of holding in abeyance its own decision on the agency’s termination of parental rights petition until after the Supreme Court has spoken. The court knows full well that its action is extraordinary, but as will become clear, the circumstances demand no less.
Stanley v Illinois (405 US 645, 657-658) was the Supreme Court’s first declaration as to the rights of unwed fathers to the care and custody of their children. In a contest between an unwed father and the State (the mother being deceased) the father’s rights were held to be substantial and fundamental, and the State’s interest in supplanting a natural parent, absent a showing of unfitness, was deemed de minimus. At its most basic level, Stanley was a recognition of the unwed father’s existence, his interest, and his right to be heard when his children’s custody was questioned. The fine question as to the standard to be used to measure his interest, particularly in cases where the natural mother was attempting to have the child adopted by her new husband, was not explicitly addressed.
Three years later that question was before the New York Court of Appeals in its 1975 Orsini decision, supra, in which the unwed father was held to have rights only to notice of the *433 hearing and an opportunity to be heard.[2] A "veto” power, or the authority to block the adoption simply because he wished to maintain his legal relationship with his child, was explicitly denied. In January, 1976 the Supreme Court denied Mr. Orsini’s appeal for want of a substantial Federal question. (Orsini v Blasi, 423 US 1042.) However, it must be emphasized that the Orsini appeal, according to the jurisdictional statement and motions to dismiss filed, was based on a stipulation before the trial court in which the unwed father conceded that the trial court could find, even in the absence of abandonment, that adoption would nonetheless be in the child’s "best interests”. (Matter of Malpica-Orsini, 36 NY2d, p 577, supra.) The case, therefore, did not present the Supreme Court with a fully contested custody or termination of rights issue, but only a sterile legal argument, i.e., that an unwed father has an absolute right to veto his child’s adoption.
The Supreme Court most recently addressed the problem of an unwed father’s rights in Quilloin v Walcott (434 US 246). There a unanimous court decided that an unwed Georgia father who had never attempted to legitimate his 11-year-old child, who had never lived in the same home with the mother or child, and who did not himself seek custody, was not entitled, as a matter of constitutional right, to block the adoption of the child by the mother’s husband. The court concluded: "Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption * * * was in the 'best interests of the child.’ ” (434 US 246, 255.)
The Caban case represents one of the "other situations”. Caban is a New York State case (56 AD2d 627, 43 NY2d 708). It challenges, clearly and unmistakably, the Court of Appeals ruling in Orsini; it presents to the court not a bare factual stipulation but a full history of the unwed father’s lengthy family life with his children. The Supreme Court’s acceptance of the appeal, based on a full trial record and challenges to classifications based on sex and marital status, would appear to represent the court’s intention to reconsider its summary affirmance of Orsini, and the inherent factual limitations of Quilloin.[3]
*434 This court will not presume to predict the outcome in Caban, but it will explain its belief as to why Caban’s challenge to New York law is real and substantial. As noted earlier, Orsini’s Supreme Court affirmance was a summary dismissal, without opinion, based on a stipulation as to the facts before the court. Quilloin’s factual record of parental involvement was clearly more complete, but the court noted, and indeed repeatedly emphasized, that the unwed father in that case had never lived with his child, nor had he assumed, or even sought, daily, full-time responsibility for his care. Those facts appear to be the cornerstone of the court’s most recent ruling in this complex area. In vivid contrast is the undisputed record of Mr. Caban’s five years of cohabitation with his children and their mother, his regular weekend visits with the children following the parents’ separation, his removal of the children to his own home after they had been sent by the mother to reside with their maternal grandmother in Puerto Rico, and his petition (with his current wife) to adopt the children. The court cannot say what the Supreme Court will decide as to Mr. Caban, nor what would be decided were Mr. R.’s different circumstances before that court.
It should be understood that this court’s decision to wait for Supreme Court clarification is not based simply on the fact that Orsini was only summarily affirmed. A summary affirmance is naturally entitled to precedential weight, and is not to be disregarded by trial courts. (Sullivan Outdoor Ad. Co. v Department of Transp. of State of Ill., 420 F Supp 815; Heany v Allen, 425 F2d 869; Port Auth. Bondholders Protective Committee v Port of New York Auth., 387 F2d 259, 263, n 3.) Neither is it simply a matter of sincere and principled disagreement with the rule of law. This court knows itself bound by the pronouncements of the Court of Appeals and the Supreme Court, and has no inclination whatever to assault the fundamental structure of our judicial system. "I recognize my duty as an inferior * * * judge to accept and follow controlling decisions of the Supreme Court of the United States whether I personally agree with those decisions or *435 whether I do not. I fully appreciate that the * * * law would soon become chaotic if judges such as I should do otherwise. But I do not believe that as a consequence of this we * * * are under a positive duty always to follow blindly.” (United States v Girouard, 149 F2d 760, 765, Woodbury, J., dissenting, revd 328 US 61.)
Rather, it is a matter of seeking the law, where the State rule is in the process of judicial reappraisal: "It is true that decisions are but evidences of the law and not the law itself; but the decisions of the Supreme Court must be accepted by the lower courts as binding upon them if any orderly administration of justice is to be attained. The developments with respect to the [most recent Supreme Court case], however, are such that we do not feel that it is incumbent upon us to accept it as binding authority.” (Barnette v West Virginia State Bd. of Educ., 47 F Supp 251, 253.)
The Supreme Court’s review of Caban clearly puts the substantive law into question. This court’s decision as to its procedural rule, that is, its decision not to apply Orsini and Caban at this time but to await clarification, is based on the analysis of the case law that follows.
Certainly, New York courts are bound by rulings of the Supreme Court as to the constitutional validity of State statutes. (People v Davis, 43 NY2d 17.) It is also well established that a summary affirmance by the Supreme Court in one case does not preclude the trial court’s consideration in a similar case of issues not raised in the earlier proceeding. (Usery v Turner Elkhorn Min. Co., 428 US 1.) In addition to citing the new issues on appeal, the Usery court also noted that "[several questions presented here * * * were raised in [the earlier summary affirmance] but having heard oral argument and entertained full briefing on these issues together with the other questions raised in the case, we proceed to treat them here more fully.” (428 US 1, 14.) Similarly, in Steinberg v Fusari (364 F Supp 922, 931), the trial court noted that the threshold question was "whether the [recent] summary affirmance * * * forecloses inquiry into the merits here”, and decided that there were "at least several reasons for supposing that the important issues here cannot be disposed of simply through a citation to Torres [the recent summary affirmance].” Among the factors cited were: the Supreme Court’s recent decisions were without opinion or discussion of the facts; the case therein was factually distinguishable; and the
*436 court had subsequently noted probable jurisdiction in a case involving "seemingly identical” issues. The District Court reasoned that: "Since the noting of probable jurisdiction represents at least a preliminary conclusion by the Court that substantial issues are posed by an appeal [citations omitted] this action * * * must stand for the proposition that Torres does not absolutely foreclose inquiry into the area. * * * Put another way, we view the summary affirmance in Torres as standing for the proposition that the Supreme Court at that time thought that the district court’s application of the law to the particular facts presented was correct. The plaintiffs claim that the law has so evolved since Torres, and that the facts here are so different, that either of the two elements individually would justify a different result here.” (Steinberg v Fusari, supra, pp 931-932.)
The Steinberg court went on to conclude that although the law’s evolution was not sufficiently compelling, the factual distinctions were important enough to require examination of the case on its merits. Subsequently the Supreme Court noted probable jurisdiction (415 US 912), only to vacate the appeal on the grounds that the statute at issue had been amended (419 US 379, reh den 420 US 955). The District Court’s decision to reach the merits, based on its perception of a factual distinction, was noted and not criticized.
Although rare, refusal by a lower court or individual Judge to apply seemingly binding superior precedent is not unique. Among the factors courts have weighed in their efforts to determine whether current precedent is binding are: substantial factual distinctions (Steinberg v Fusari, supra); recent trends in substantive judicial opinion favoring change in the rule (United States v Girouard, 149 F2d 760, Woodbury, J., dissenting, revd 328 US 61, supra); pending Supreme Court review of a similar case (Steinberg, supra); presentation of new legal as well as factual issues not reviewed earlier (Usery, supra; Sullivan, supra); and, finally, the weight and constitutional dimension of the rights at issue (Barnette, supra).
Most of these factors are clearly present in this case. Less plain is a judicial trend favoring a change in the rule. The Súpreme Court’s decisions in Stanley and Quilloin do not themselves indicate that a change is likely. However, the Quilloin court was careful to note that the unwed father had presented his jurisdictional statement on appeal solely on the grounds of discrimination on the basis of marital status, i.e., *437 between married and unmarried fathers. A reference in his brief to sex-based discrimination (between unwed fathers and mothers) was found not appropriate at that stage of the litigation and the court explicitly declined to consider the argument. (434 US 246, 253, n 13.) In contrast, Caban’s jurisdictional statement and brief contained full arguments as to sex-based discrimination, and there is no reason to believe the court will not consider that issue. It must be noted that the vast majority of recent challenges to statutes employing a gender-based distinction have been found meritorious by the Supreme Court. (Orr v Orr, 440 US 268; Reed v Reed, 404 US 71; Diaz v Pan Amer. World Airways, 442 F2d 385, cert den 404 US 950; Frontiero v Richardson, 411 US 677; Weinberger v Wiesenfeld, 420 US 636; Stanton v Stanton, 421 US 7; Craig v Boren, 429 US 190; cf. Kahn v Shevin, 42 USLW 4591, April 24, 1974; Califano v Webster, 430 US 313.) The weight of judicial opinion favoring Mr. Caban’s claim of unconstitutional sex-based discrimination is therefore substantial.
The court declines to apply the New York rule pronounced in Orsini and Caban for much the same compelling reasons cited by the Federal District Court in Barnette, when it declined to enforce a State flag-salute statute. After noting that the rationale and legal authority for the earlier rulings had been made uncertain by later developments, the court concluded: "Under such circumstances and believing, as we do, that [the statute as applied] is violative of religious liberty * * * we feel that we would be recreant to our duty as judges, if through a blind following of a decision which the Supreme Court itself has thus impaired as an authority, we should deny protection to rights which we regard as among the most sacred of those protected by constitutional guaranties.” (Barnette, 47 F Supp 251, 253, supra.)
Despite the presence of all these factors, the court is loathe "to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant” (Spector Motor Serv. v Walsh, 139 F2d 809, Hand, J., dissenting, revd 323 US 101). The court has weighed the genuine personal interests at stake here; these are questions affecting the lives of three young children and the adults who claim to love them. It has also examined the legal issues, and concludes that a precipitous decision on the merits of the guardianship petition would only produce more vexing litiga *438 tion. Needless trauma would ensue if this court were to open the road to adoption only to have the Supreme Court bar the way by overruling Orsini.[4] See, also, the tortuous history of Rothstein v Lutheran Social Servs. of Wis. & Upper Mich. (405 US 1051) following remand of the adoption therein in accordance with Stanley v Illinois (405 US 645). (State ex rel. Lewis v Lutheran Social Servs. of Wis. & Upper Mich., 59 Wis 2d 1, 68 Wis 2d 36.)
The court will therefore preserve the status quo; it will allow these children what family stability is possible under the circumstances by deciding only the separate issue of custody without reaching the question of terminating parental rights. The court is aware that CPLR 4213 provides that a decision must be reached within 60 days of the last written submission. However, under the Family Court Act the provisions of the CPLR are applicable only "to the extent that they are appropriate to the proceedings involved.” (Family Ct Act, § 165.) For the reasons outlined above, this court does not find a strict adherence to CPLR 4213 to be appropriate in this instance. (Cf. Schwartz v Schwartz, 23 AD2d 204.)
[Further material omitted for the purposes of publication.]

. (Cf. Matter of Corey L. v Martin L., 45 NY2d 383; see, also, Domestic Relations Law, § 111; Matter of Elizabeth Green, NYLJ, Dec. 12, 1978, p 12, col 6).

. The holding was based solely on judicial interpretation of Stanley. Only after the Orsini case was decided did the State Legislature enact section 111-a of the Domestic Relations Law (L 1976, ch 665, eff Jan. 1, 1977) requiring that putative fathers be given notice of adoptions and an opportunity to be heard and to present evidence as to the child’s "best interests”.

. There is in addition a legal distinction between Quilloin and the New York cases. *434 The Supreme Court interpreted the Georgia law in Quilloin to provide full parental rights to an unwed father who had legitimated his child: "Had the trial court granted legitimation, appellant would have acquired the veto authority he is now seeking.” (434 US 246, 253-254.) In contrast, the New York statutes expressly provide that an adjudicated unwed father — one who has obtained an order of filiation — is entitled to no more than notice and an opportunity to be heard on the question of the child’s best interests. (Domestic Relations Law, §§ 111, 111-a; Social Services Law, § 384-c.)

. It is quite possible that a Supreme Court reversal of the Orsini holding would have to be given retrospective effect, at least with regard to those cases in the appellate process at the time the decision is rendered. (Matter of D., 36 AD2d 970.)