Matter of M./B. Children (2004 NY Slip Op 24554)

Matter of M./B. Children

2004 NY Slip Op 24554 [7 Misc 3d 272]

December 22, 2004

Freeman, J.

Family Court, Kings County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, May 04, 2005

[*1]
In the Matter of the M./B. Children.
Family Court, Kings County, December 22, 2004

APPEARANCES OF COUNSEL

Michael D. Carlin for respondent father. Andrea Peyser for petitioner. Daniel Greenbaum, Law Guardian.

OPINION OF THE COURT

Nora Freeman, J.
These petitions to terminate the parental rights of Leslie B. and Antoinette M. were filed in December 2002, alleging that Ms. M. (the mother) permanently neglected the children and that, pursuant to section 384-c of the Social Services Law and section 111 (1) (d) of the Domestic Relations Law, Mr. B. (the father) is entitled only to notice of the proceedings and an opportunity to be heard as to the children's best interests. Respondent father's motion to dismiss was filed on July 15, 2004. Counsel for petitioner Lutheran Social Services (the agency) and the Law Guardian filed affirmations in opposition, which the court deemed unresponsive. At the court's direction, petitioner and Law Guardian submitted supplemental affirmations in opposition. Respondent's counsel also filed a "reply affirmation in support of the motion" and, on December 10, over objection by the Law Guardian and petitioner, the court accepted respondent's "reply to petitioner's supplemental affirmation in opposition." Mr. B. moves to dismiss the petitions on the grounds that Domestic Relations Law § 111 (1) (d), which sets forth the criteria necessary for an unwed father's consent to be required for the adoption of his children, is unconstitutional as applied to him. (The Attorney General did not respond to Mr. B.'s notice of motion.)

Factual History

The facts necessary to decide the motion are undisputed, and largely established by court orders of which the court takes judicial notice. Leslie B. and Antoinette M. never married, but had five children between the years 1989 and 1997: Freedom, born February 21, 1989; Stephon, born July 26, 1990; Fantashia, born June 22, 1993; Lucinda, born March 3, 1995; and Shaqueal, born December 21, 1997. Orders of filiation recognizing Mr. B. as the father of Freedom, Stephon, Fantashia and Lucinda were entered under docket numbers P-9782/89 (CSET); P-1638-39/96; P-2646-47/96. (It appears that an order of filiation was granted in 1989 and again in 1996 for the same child, Freedom.) In 1996 Mr. B. petitioned for custody [*2]of the four children Freedom, Stephon, Fantashia and Lucinda, and on July 22, 1996 Judge Sarah Schecter granted him sole custody of those children (petitioner's exhibit A). (The fifth child, Shaqueal, was not born until 1997.) Ten months later custody was transferred by Judge Schecter to the children's maternal grandmother by orders dated May 21, 1997, which included orders of visitation for Mr. B. (but not for the children's mother) (petitioner's exhibit B).
Neither petitioner nor the Law Guardian challenge the accuracy of Mr. B.'s claim, presented in counsel's affirmation in support of his motion, that he was incarcerated during the period 1998 to June 2003. Petitioner's witness, maternal grandmother Lucille M. (who is the children's foster mother) testified that Mr. B. was released from prison in the summer of 2003; that he telephoned his children (who have been in their grandmother's foster home for years) "all the time," and that he has seen them on several occasions since his release.
The four older children have remained continuously in foster care since September 2000, pursuant to voluntary placement by their grandmother (who later became their foster mother and is now the "pre-adoptive" resource). Shaqueal's foster care placement was under a neglect case, N-19998/98; he was placed on September 9, 1999, with subsequent extensions of placement. (Throughout his placement, Shaqueal has lived in a foster home separate from his siblings.) The agency's petitions to terminate parental rights were filed in December 2002. On April 30, 2004 this court found by clear and convincing evidence that Ms. M. had, as alleged, permanently neglected the children. Based on favorable reports regarding her progress in drug treatment after the petitions were filed (see petitioner's exhibit 1 at Sept. 30, 2004 hearing), the agency intended to consent to a suspended judgment for the mother. As to Mr. B., the agency presented testimony from the caseworker and the foster mother/grandmother as well as several exhibits (including voluminous case records for the years 1999 through 2003) in support of its position that Mr. B. is not a father whose consent is required for adoption, but merely a "notice" father entitled to be heard as to whether termination of parental rights is in the children's best interest. Just recently, on December 10, 2004 the court was informed that the agency no longer supports a suspended judgment for the mother, but will pursue adoption.
To summarize Mr. B.'s relationship with his children: he was never married to Antoinette M.; he has court orders of filiation for four of the five children; he had sole custody of the four older children from 1996-1997, and thereafter received court orders for visitation; from 1998 to June 2003 he was incarcerated; he has never lived with Shaqueal, does not have an order of paternity for him, and has had very limited contact with him (including three visits while incarcerated at Rikers Island in 1999); he filed new petitions for custody of all five children in 2002, while on "work release" (Dockets No. V-20135/02, V-20139-42/02) which were dismissed without prejudice when he was reincarcerated later that year; and he opposes termination of his rights and adoption. The agency relies on Domestic Relations Law § 111 (1) (d) to assert that Mr. B. does not meet the statutory criteria for an unwed father whose consent to adoption is required, and specifically "objects to and disputes the characterization of Notice Father's relationship with any of the children as 'very significant.' " Mr. B. argues that, based on the undisputed factual history summarized above, he has a substantial relationship with his children which is entitled to protection, and that application of Domestic Relations Law § 111 (1) (d) to him would deprive him of his constitutional rights.
The memorandum of law presented by Mr. B.'s counsel in support of the motion cites [*3]several decisions by the United States Supreme Court, the New York State Court of Appeals, and New York appellate courts in support of his position. In their affirmations in opposition counsel for the agency and the Law Guardian offer no analysis of case law or statutes, choosing instead to oppose the motion on procedural grounds: that the facts relied upon by Mr. B. have not been established by his sworn testimony, and therefore the motion is premature. They appear to overlook the record as developed through the agency's own witnesses and exhibits, and prior court orders. After review of the exhibits, the testimony of the agency's witnesses, and of prior Family Court orders, this court accepts Mr. B.'s presentation of the relevant facts (as summarized above) and, based on its review of controlling case law, concludes that section 111 (1) (d) as applied to Mr. B., and his four older children is unconstitutional. Accordingly, the motion is granted, and the petitions against Mr. B. shall be dismissed.

Constitutional Analysis

As the Court of Appeals noted in Matter of Raquel Marie X., "Until the 1970's, unwed fathers had no legally recognized interest" in their children. (76 NY2d 387, 397 [1990].) In past centuries these children were deemed filius nullius (no man's child) or filius civitas (the state's child). The support of such children was the obligation of the parish or the county, and until well into the mid-twentieth century the focus of paternity statutes was purely monetary—securing financial support from the father, in order to ease the burden on the public purse. Until 1976 New York law (Family Ct Act art 5) permitted only the child's mother or the welfare department to file paternity petitions; it was they, after all, who were supporting the illegitimate child, and obtaining an order of paternity was a prerequisite to an order of child support. The 1976 amendments (L 1976, ch 665, § 6) permitted a "person alleging to be the father" to file a paternity petition. Permitting fathers to file paternity petitions was only one of many reforms, both statutory and through case law, that transformed American law governing the status of children born out of wedlock and their parents. (See, e.g., EPTL 4-1.2 [a] [2]; Pickett v Brown, 462 US 1, 7 [1983] and numerous cases cited therein.) Advances in scientific technology now produce DNA test results that show probabilities of paternity up to 99.99%. New York law (Family Ct Act § 532 [a]) now establishes a presumption of paternity when the DNA probability is higher than 95%. Written, sworn acknowledgments of paternity by both parents have the full legal effect of an order of filiation (Family Ct Act § 516-a; Social Services Law § 111-k; Public Health Law § 4135-b). And legally recognized paternity, whether established by court order or sworn acknowledgment, legitimates the child for virtually all purposes, including inheritance, eligibility for government benefits, and the exercise of rights to seek custody or visitation.
All questions relating to marriage and legitimacy are sensitive, particularly in a multicultural society that strives to respect religious beliefs while separating the realms of church and state. Of all the issues, no aspect of family law is more challenging than balancing the interests between parents of a child born out of wedlock. Every step providing enhanced protections for fathers has been resisted on social policy grounds—strongly held beliefs that single mothers struggling to raise infants must be protected from irresponsible fathers; adoptions must be encouraged; fathers must be prevented from extorting cash in exchange for their cooperation. (See Matter of Malpica-Orsini, 36 NY2d 568, 572-574 [1975], appeal dismissed sub nom. Orsini [*4]v Blasi, 423 US 1042 [1976].) But for better or worse society has accepted exponential increases in the number of out-of-wedlock births. The Court of Appeals noted in 1990 that "[t]he evolution of the case law, and corresponding amendments of the New York statute, are themselves a commentary on changing family patterns and social attitudes toward unwed fathers." (Matter of Raquel Marie X., supra at 397.) The case before this court represents but one step in a 30-year progression, which may be summarized briefly as follows.
Stanley v Illinois (405 US 645 [1972]) established the fundamental right of a father—even if unwed—to a hearing before the state intervened to remove his children. Peter Stanley had lived with his children and their mother for several years before her death, at which time Illinois child welfare authorities removed the children from his care without a hearing, since Mr. Stanley was not recognized under Illinois as a "parent." The Supreme Court held that an unwed father who had "sired and raised" his children had parental rights that could not be denied without due process, at a minimum a hearing as to his fitness. (Id. at 651-652.)
Quilloin v Walcott (434 US 246 [1978]) illustrates what limitations on unwed fathers' rights the Court found constitutionally acceptable. Mr. Quilloin, who had never had custody of his son, or provided regular financial support, or sought to legitimate him (until receiving notice of the boy's proposed adoption by the mother's new husband) was not found to have "shouldered any significant responsibility" for his child (id. at 256), and the Court refused to recognize a "right to veto" the adoption by the mother's husband, which would give legal status to an existing family relationship.
The following year, the Supreme Court decided Caban v Mohammed (441 US 380 [1979]) in which the birth father had lived with his child and the mother for several years before the couple separated. When the birth mother and her new husband filed an adoption petition, Mr. Caban and his wife filed a cross petition. The Supreme Court held (with a five-vote majority and several dissenting opinions) that the facts in Caban "demonstrate[ ] that an unwed father may have a relationship with his children fully comparable to that of the mother." (Id. at 389.) The Court urged that future legislation focus on "cases where the father never has come forward to participate in the rearing of his child." (Id. at 392.)
Caban was a New York case, and the Legislature's response came the following year, with enactment of chapter 575 of the Laws of 1980. Domestic Relations Law § 111 was amended to add two new subdivisions, (1) (d), specifying the criteria under which the unwed father's consent would be required when a child older than six months was "placed for adoption" and subdivision (1) (e), governing cases in which infants were placed before they were six months old. Section 111 (1) (d) provides in pertinent part that the consent of the unwed father is required
"only if such father shall have maintained substantial and continuous or repeated contact with the child as manifested by: (i) the payment by the father toward the support of the child of a fair and reasonable sum . . . and either (ii) the father's visiting the child at least monthly when physically and financially able to do so and not prevented from doing so by the person or authorized agency having lawful custody of the child, or (iii) the father's regular communication with the child or with the person or agency having the care or custody of the child, when physically and financially unable to visit the child or prevented from doing so."
The constitutionality of section 111 (1) (d) was challenged in 1985 in Matter of Andrew Peter H.T. (64 NY2d 1090 [1985]). The birth father, who had lived with the child and mother for [*5]several years, opposed adoption by the mother's husband, and prevailed in the Family Court and Appellate Division, which held that he had met the statute's "communication requirement" and dismissed the adoption petition. The Court of Appeals, however, reversed and remanded the case for consideration of whether the father had satisfied, or was excused from satisfying, "the threshold support provision." The Court declined to address the father's constitutional argument that section 111 (1) (d) violated his right to equal protection. (Id. at 1092.)
In Matter of Raquel Marie X. (76 NY2d 387 [1990]), however, the Court of Appeals confronted the constitutional issues, holding that a provision of Domestic Relations Law § 111 (1) (e)—governing the criteria for consent when the child is placed for adoption before the age of six months—is unconstitutional. Subdivision (1) (e) included a requirement that a birth father live openly with the child's mother for six continuous months before the adoptive placement. The Court found that provision to be unacceptable because it "cuts off [the father's] interest by imposing as an absolute condition an obligation only tangentially related to the parental relationship." (Id. at 405.) Writing for the unanimous Court, Judge Kaye noted that the "living together requirement" focuses on the relationship between father and mother, rather than father and child, and that it can easily be used by the mother to block the father's rights. (Id.)
Application of section 111 (1) (d) to Leslie B. would require a ruling by this court that his consent is not required, since there is no evidence in the record that he provided financial support—except for the period 1996-1997, when he had sole legal custody. Theoretically, Mr. B. could present such evidence if the trial were to continue, but he has not claimed such support, and his motion is predicated on his failure to satisfy the statutory criteria. New York courts have called financial support "the threshold question" (see Andrew Peter H.T., supra; Matter of Maxamillian, 6 AD3d 349 [lst Dept 2004]). The question presented by respondent's motion to dismiss is whether, assuming (or conceding) that Mr. B. does not satisfy the requirements of, first, providing financial support and, secondly, either visiting or communicating with the children on a regular basis, his consent is nonetheless required because he has, in other ways, established a relationship with his children that is sufficiently "substantial" or "significant" to merit constitutional protection of his rights, comparable to the protection granted to unmarried mothers and married/divorced fathers.
The appropriate standard for review was stated in Caban: "Gender-based distinctions must serve important governmental objectives and must be substantially related to achievement of those objectives in order to withstand judicial scrutiny under the Equal Protection clause." (Caban, supra at 388 [internal quotation marks omitted].) The Court of Appeals, analyzing the Supreme Court's Quilloin decision, wrote that "the Supreme Court identified the issue, unresolved by Stanley, as one of the degree of protection a State must afford the rights of an unwed father in a situation, such as that presented here, in which the countervailing interests are more substantial." (Raquel Marie X., supra at 398 [internal quotation marks omitted], quoting Quilloin, supra at 248.) The Court of Appeals also stated that the Supreme Court defined "the father's liberty interest [and] characterized the rights of the parents [as] a counterpart to the responsibilities they have assumed." (Id. at 400 [internal quotation marks omitted].)
Having determined the correct standard, the next question is what actions by the father will support a conclusion that the father has a constitutionally protected liberty interest. The clearest example is Mr. Stanley. The Supreme Court announced that a father who lived with his children and their mother for over a decade before her death, a father who "sired and raised" his [*6]children, has a constitutionally protected liberty interest. Likewise, Mr. Caban, having lived with his children and their mother for five years "demonstrates that an unwed father may have a relationship with his children fully comparable to that of the mother." (Caban, supra at 389.) In sharp contrast are the failures of other fathers, elaborated by the Caban court: "In rejecting an unmarried father's constitutional claim in Quilloin v Walcott . . . we emphasized the importance of the [father's] failure to act as a father toward his children, noting that he 'has never exercised actual or legal custody . . . and thus has never shouldered any significant responsibility . . . .' " (Caban, supra at 389 n 7, quoting Quilloin, supra at 256.) When the New York Court of Appeals analyzed Quilloin, it noted that Mr. Quilloin "did [not] attempt to legitimate [the child] until receiving notice of the proposed adoption." (Raquel Marie X., supra at 398.) The Raquel Marie X. court noted that Mr. Quilloin "had never established a substantial relationship with his child, and hence (unlike Caban) was not similarly situated with the child's mother." (Id. at 400.) Finally, the Court of Appeals noted that "[i]n Caban, involving an unwed father who did not have a current custodial relationship with his children, the court gave determinative significance to the fact that he nonetheless had demonstrated a continuing willingness to have such a relationship." (Id. at 402 [emphasis added].) (The Caban court itself noted in a footnote that it was speculative as to whether New York's sex-based distinctions "might not apply to those unwed fathers who obtain legal custody" [Caban, supra at 388 n 6]).
The decisions of both the Supreme Court and the New York Court of Appeals focus primarily on the gender distinctions between unwed mothers and fathers. In footnote 16, Caban notes that "[a]ppellant also challenges the constitutionality of the distinction . . . between married and unmarried fathers," but "[a]s we have resolved that the sex-based distinction of § 111 violates the Equal Protection Clause, we need express no view as to the validity of this additional classification." (Id. at 394 n 16.) However, the analysis by the New York Court of Appeals of the "living together" requirement that it ultimately rejected uses language that is arguably applicable to "marriage" requirements. Under Domestic Relations Law § 111 (1) (b), consent to adoption is required of a father of a child "born in wedlock" regardless of his relationship, if any, with the child. In rejecting "living together" with the child's mother as a valid criterion for establishing the right to consent, the Court repeatedly noted how "tangential" and "incidental" to the father-child relationship living with the mother was; living with the mother is "directed . . . principally to the father-mother relationship." (Raquel Marie X., supra at 405-406.) The same can be said of marriage: it is fundamentally a relationship between father and mother, or, indeed, between husband and wife, if they are childless. The statute's assumption that a father who is (or was) married to the child's mother has had a significant or substantial relationship with the child, although implicit, is clear—because the statute requires the consent of that father without further qualification. The implicit assumption about the behavior of married fathers is occasionally made explicit in the cases, as, for example, in Raquel Marie X., when the court noted that Mr. Quilloin failed to assume any significant responsibility for his child's daily supervision and care, "a responsibility that a once-married father would have exercised during marriage." (Raquel Marie X., supra at 398.) It may be necessary to state the obvious: being married to the mother has no more to do with the father-child relationship than "living with" her. To present the most extreme example, a man who marries a woman on January 1, impregnates her on January 2, and leaves her and the marital home on January 3, never to see her again, and never to see his child at all, clearly has not "exercised responsibility during marriage," but under Domestic Relations Law § 111 (1) (b) his consent to the child's [*7]adoption is required and can only be terminated for cause. Nor can it be said that the married father is different from the unwed father by virtue of having legitimated the child through marriage. The unwed father may also legitimate his child, by obtaining an order of filiation (for which he can file even before the child is born). A man's legal relationship with his child can be established either through marriage to the mother or by an order of filiation. The difference, of course, is that marriage requires the mother's consent, while the order of filiation does not. This is precisely the kind of control exercised by the mother that the Court of Appeals rejected in Raquel Marie X.
The actual bond between father and child is quite distinct from the legally recognized relationship, and can be established by married and unmarried fathers alike. Granting the right to consent to married fathers without additional requirements to demonstrate a "substantial" or "significant" relationship to their children, while imposing such requirements on unwed fathers, discriminates against men who cannot unilaterally change their married/unmarried status. (In rejecting a claim of "consent" status by a father who married the child's mother after the baby was placed for adoption, the Court of Appeals wrote that "[m]arriage obviously may be considered as one factor in determining whether the father has manifested the requisite parental responsibility, but the marriage must be timely in order to be considered substantial." (Raquel Marie X., supra at 409 [emphasis added].) This sentence raises intriguing questions: does the Court suggest that some marriages are not "substantial"? Is the consent of a father of a child born "in wedlock" required only if his marriage is—or was—"substantial"? What might the criteria be?

Applying the Law to the Facts

It is not the role of trial courts to make new law, but to apply recognized law. (Marcus Assoc. v Town of Huntington, 45 NY2d 501 [1978].) Another Family Court Judge, addressing similar questions of changing standards governing fathers' rights in 1979, one month before the Supreme Court decided Caban v Mohammed, noted that "[t]his court knows itself bound by the pronouncements of the Court of Appeals and the Supreme Court, and has no inclination whatever to assault the fundamental structure of our judicial system." (Matter of Yvonne Marie R., 99 Misc 2d 427, 434 [Fam Ct, Bronx County 1979].) She went on to quote from a dissenting opinion from the First Circuit Court of Appeals:
"I recognize my duty as an inferior . . . judge to accept and follow controlling decisions of the Supreme Court of the United States whether I personally agree with those decisions or whether I do not. I fully appreciate that the . . . law would soon become chaotic if judges such as I should do otherwise. But I do not believe that as a consequence of this we . . . are under a positive duty always to follow blindly." (Id. at 434-435, quoting United States v Girouard, 149 F2d 760, 765 [1945, Woodbury, J., dissenting], revd 328 US 61 [1946].)
This court is mindful of its duty not only to apply, but to interpret, the law. The Court of Appeals, after declaring the "living together" requirement in Domestic Relations Law § 111 (1) (e) unconstitutional, noted that "[e]stablishing a proper substitute is of course the prerogative of the Legislature, not the courts" and added that pending new legislation the "courts will be guided by principles gleaned from the Supreme Court decisions, which define an unwed father's right to a continued parental relationship by his manifestation of parental responsibility." (Raquel Marie X., supra at 407-408.) That is what is required of this court.
Leslie B. cannot change his sex or (unilaterally) his marital status in order to acquire the rights granted to married fathers and all mothers under subdivision (1) (b) and (c) of Domestic Relations Law § [*8]111. He did, however, manifest his significant, substantial relationship with his children. Although his name is not on any of the birth certificates, he obtained orders of filiation for the four eldest children. According to the grandmother's testimony, Mr. B. was very much involved with the four older children's daily care even before he obtained custody. He then sought and obtained orders of custody, which were in effect for 11 months. (The record does not show whether, as is usually the case, he had physical custody for some period before he obtained the court orders.) He, unlike Mr. Caban, had sole custody, not merely sharing custody with the children's mother during periods of cohabitation. When custody was transferred to the grandmother, he (but not the mother) was granted court-ordered visitation. His ongoing telephone contacts with his children was established unequivocally by the grandmother's testimony, who also testified that he had visits after his release from prison in June 2003. In this court's view, Mr. B.'s circumstances more closely resemble those of Mr. Stanley and Mr. Caban, rather than Mr. Quilloin. He satisfies the parameters set out in Raquel Marie X.: "The protected interest is not established simply by biology. The unwed father's protected interest requires both a biological connection and full parental responsibility; he must both be a father and behave like one." (Raquel Marie X., supra at 401.) There is no doubt that an unwed mother—who at one point had custody, then lost it, who was incarcerated but maintained some contact with her children while imprisoned, who resumed contact upon her release—could not be deprived of her rights unless a petition pursuant to Social Services Law § 384-b were filed and granted. This father is entitled to no less. To impose the requirements in subdivision (1) (d) to Mr. B., when they are not required of mothers and married fathers, would, in this court's judgment, constitute denial of equal protection based on sex and marital status. The court concludes, therefore, that Domestic Relations Law § 111 (1) (d) is unconstitutional as applied to Leslie B. and his four older children. Since the agency relies solely on that subdivision to argue that he is not a "consent father," the petitions concerning those children against him are dismissed. As to Shaqueal, born in December 1997, shortly before Mr. B. was incarcerated, his relationship is not so substantial as to create parental rights under Stanley, Caban and Raquel Marie X. He did not live with Shaqueal, or obtain an order of paternity, or obtain court orders of custody or visitation. Accordingly Mr. B.'s motion to dismiss that child's petition (B-27605/02) is denied.
Having ruled that Mr. B. has parental rights on a par with all mothers and with married fathers, the court notes that he, like those other parents, may lose his rights if the agency pleads and proves, by clear and convincing evidence, that he has either abandoned or (like Ms. M.) permanently neglected the children (see Social Services Law § 384-b). But the agency must first give him notice of such allegations by filing the proper petitions and then prove them by clear and convincing evidence. The burden is properly the agency's to prove a statutory basis for terminating his rights, not Mr. B.'s, to establish his right to consent. See Matter of Taylor R. (290 AD2d 830 [3d Dept 2002]) and Matter of Doral B. (2 AD3d 1338 [4th Dept 2003]) for discussions of the different burdens under subdivision (1) (d) and (e) and subdivision (2) of Domestic Relations Law § 111 and those under Social Services Law § 384-b.